Rel: December 19, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2025-2026

_____

## CR-2023-0911

_____

## Tapero Carleone Johnson

## v.

## State of Alabama

## Appeal from St. Clair Circuit Court
## (CC-21-240)

ANDERSON, Judge.

Tapero Carleone Johnson was convicted in the St. Clair Circuit Court of a single count of capital murder for causing the death of Moody Police Sergeant Stephen Williams while Williams was on duty or in the

act or performance of an official or job-related duty.[1] See § 13A-5-40(a)(5), Ala. Code 1975. After finding that Johnson's offense knowingly created a great risk of death to many persons, see § 13A-5-49(3), Ala. Code 1975, and that Sergeant Williams was killed while serving as a police officer in the line of duty, the jury voted 10-2 to return a verdict of death. The circuit court imposed a sentence of death pursuant to the jury's verdict. See § 13A-5-47(a), Ala. Code 1975. Johnson appealed. For the reasons below, we affirm the circuit court's judgment.

Facts and Procedural History

On June 2, 2020, Johnson and Marquisha Tyson, his girlfriend, checked in to Room 222, a second-floor room, at the Super 8 Motel in Moody. Surveillance cameras at the motel captured Tyson and Johnson's arrival, registration, and initial entry into the room. Those cameras also showed that, shortly after checking in, the pair left the motel. Other video evidence, and Johnson's own statement to law-enforcement officers, established that the pair travelled to a local fast-food restaurant and convenience store before returning to the motel at approximately 8:15

---

[1]Sergeant Williams was posthumously promoted to the rank of lieutenant. Because he was a sergeant at the time of Johnson's offense, we refer to him as Sergeant Williams in our decision.

p.m. The motel's surveillance system captured Tyson's car returning to the motel, driving to the opposite side of the building from the couple's assigned room, and parking at the far end of the building. That video also showed that neither Johnson nor Tyson carried any suitcases or visible clothing items from their car to Room 222. Instead, Johnson carried a small backpack containing multiple firearms and ammunition into the room.

At approximately 9:30 p.m., the Moody Police Department dispatched officers to Room 222 at the Super 8 Motel in response to multiple emergency 911 calls placed by a female caller, later determined to be Tyson. In those calls, Tyson claimed she had been followed to the motel by four black males, two of whom she said were in a car in the parking lot and two of whom she said were outside of her motel room. When asked to describe the vehicle the black males used to follow her, Tyson was unable to provide any description. While Tyson's first five 911 calls did not reveal that Johnson was inside Room 222 with her, on her sixth and final 911 call Johnson could be heard speaking in the background.

Sergeant Williams was one of the police officers dispatched to the motel in response to Tyson's 911 calls. He was accompanied by Officer Carl Locklear, a newly hired trainee. Multiple video cameras -- including surveillance cameras, a motel guest's cell-phone camera, Sergeant Williams's body camera, and other responding officers' body cameras -- captured the events that occurred outside Room 222 as Sergeant Williams and Officer Locklear responded to Tyson's 911 calls. That footage showed Sergeant Williams's arrival at the motel and his approach to Room 222's door. The videos also showed Sergeant Williams being struck down by a barrage of gunfire erupting from inside Room 222 as he began knocking on its door. Sergeant Williams was struck by bullets in his left arm, left chest, and both legs.

Other responding officers took cover as gunshots continued to be fired from inside the motel room over the next four minutes. During that time, at least two law-enforcement vehicles in the motel parking lot were struck by projectiles. The continued gunfire from Room 222 prevented other responding officers from being able to reach Sergeant Williams to render aid or to move him to safety, but, eventually, officers were able to approach Sergeant Williams and drag his body out of the line of gunfire

4

and into the parking lot. Despite those heroic efforts to move Sergeant Williams to medical first responders, he later died from his wounds.

Approximately four minutes after the first shots were fired from inside Room 222, the gunfire ended. Later, police discovered that Johnson had fired multiple weapons until they either malfunctioned or ran out of ammunition. At the time Johnson ceased firing, the State's evidence placed the total number of rounds he had fired at 43; 12 of those rounds were fired through the door to Room 222. During the ensuing lull, at least one police officer heard a male voice inside Room 222 say the word "police," to which the officer responded, "I am the police" and "you shot the police." (R. 765-66.)

Approximately 10 minutes after the first shots were fired, Tyson and Johnson exited Room 222 and surrendered to police. Before the pair exited the room, Johnson could be heard on body-camera recordings yelling, "Is that the police?," "I've been followed all day long," and "they shot at me first." (R. 692.) Johnson told another police officer that he did not know he had been shooting at police. (R. 807.)

After Johnson and Tyson were taken into custody, a police tactical unit cleared Room 222 to ensure that it was safe for investigative

personnel to process it for items of evidentiary value. Inside the room, investigators recovered a .22-caliber pistol, a Magnum Research .40-caliber Desert Eagle pistol, a Mossberg 9mm pistol with an extended magazine, a micro-Draco 7.62mm pistol, a Taurus ultralight .38 special revolver, and numerous cartridge casings. The door to Room 222, which was admitted into evidence at trial, contained 12 "defects" -- holes left by projectiles originating inside the room and exiting through the door. The room's window had also been shot out. Investigators did not find any suitcases, clothing, or personal-hygiene items inside the room, but they did recover a small backpack containing additional ammunition, identification documents belonging to Johnson, and a laptop. Additionally, several bags of green, leafy material consistent with marijuana were recovered, along with a partially burnt marijuana cigar.

Additional weapons were recovered from Tyson's vehicle, along with documents belonging to Tyson and Johnson. Papers recovered from the vehicle included handwritten statements such as "f*ck the police," "street name Pistol Pete," and "Imma n*gg* with a gun the white man can't stand. The police, the modern day Ku Klux Klan." (R. 1065.)

After being advised of his Miranda[2] rights, Johnson waived those rights and agreed to be interviewed by police. Johnson told police that he had smoked marijuana -- approximately one-half of a marijuana cigar -- and watched a TV show after returning to the motel from dinner. Johnson conceded that he had brought no clothing items with him to the room. He told police that he dialed 911 but handed the phone to Tyson once the call was placed. Two minutes after the first 911 call, Johnson said he told Tyson to go into the bathroom and call 911 again.

Johnson told police that four shots came through the window to Room 222 before he began firing through the door -- a claim that was disproved by the video evidence of the shooting. Johnson also told police that he fired the weapons he had carried to the room until they jammed or ceased firing. Although he admitted to being the person who fired the shots from inside Room 222, Johnson claimed that he was defending himself against four black males that had been following him around throughout the day. But contrary to Tyson's representations during the 911 calls, Johnson told police that he and Tyson last saw the four black males in a white vehicle on a highway before the couple arrived in Moody.

---

[2]Miranda v. Arizona, 384 U.S. 436 (1966).

Instead, Johnson claimed in his statement that he had <u>heard</u> the voices of the four black males at the motel, not that he had seen them on the property. Nonetheless, Johnson maintained that he shot through the room's door only after several gunshots were fired into the room through its window.

The video evidence of Johnson and Tyson's arrival at the motel, their initial entry into Room 222, their stop at the fast-food restaurant and convenience store, and their return to the motel and Room 222 failed to reveal the presence of the four black males. Surveillance footage leading up to the shooting also failed to reveal the presence of two black males outside Room 222, as Tyson had represented during her 911 calls.

The State rested after presenting the foregoing evidence, and Johnson moved the circuit court for a judgment of acquittal. The circuit court denied Johnson's motion, and the case was submitted to the jury on the sole charge of capital murder and Johnson's claim of self-defense. The jury convicted Johnson of the capital murder of Sergeant Williams while Sergeant Williams was serving on duty as a Moody police officer. (R. 1693-95.)

The trial then proceeded to the penalty phase. The State rested its penalty-phase case after adopting the evidence admitted during the guilt-phase of trial. (R. 1717-18.)

Johnson presented the testimony of Joanne Terrell, a clinical and forensic social worker. Terrell testified regarding a psychosocial mitigation report she prepared in anticipation of a potential penalty phase, which was admitted into evidence as Defendant's Exhibit 18. (C. 1025-35; R. 1728-29.) Terrell told the jury that she compiled her report after interviewing Johnson and 11 of his family members, as well as conducting a review of available records.

According to Terrell, her investigation found that Johnson was born to a teenage mother who was unable to provide a stable environment. Although Johnson's mother worked and provided for him financially, Terrell testified, her employment kept her from providing for him emotionally. (R. 1730.) As a result, Johnson frequently stayed with his grandmother, who had a 15-year history of mental illness. (Id.) Terrell also stated that Johnson's father "was never a part of [Johnson's] life [and] did not want to be part of his life." (Id.) Although Terrell believed that Johnson's father was never present in Johnson's life, she reported

9

that he was a drug dealer "in and out of state and federal prisons because of the drug dealing." (R. 1755.) Consequently, Terrell did not believe that Johnson had any consistent, stable, and positive male role models in his life.

Terrell also told the jury that Johnson had served as the sole caregiver for his sister, who was born when Johnson was 9 or 10 years old, because of their mother's employment and because Johnson's mother liked to party on weekends. Terrell believed that the absence of Johnson's mother and father created abandonment issues that damaged his emotional development and limited his ability to attach to others. (R. 1731.) Terrell recounted that Johnson's family members told her that he had moved residences five times before entering high school and that he had been unable to adjust to high school. Based on this history, Terrell told the jury that she did not believe that Johnson had had the opportunity to develop the appropriate attachments during the crucial, formative years of his youth.

Terrell also reported that Johnson had been shot in the neck when he was 17 years old, having been caught in the crossfire of a neighborhood shootout. Terrell testified that Johnson's "lack of a fully developed

10

personality" caused this to be a "very serious traumatic event." (Id.) That trauma included weeks of hospitalization followed by physical and occupational therapy to relearn how to walk, use utensils, and talk, but he did not receive any mental-health treatment. Terrell opined that being shot caused Johnson to later suffer post-traumatic stress disorder ("PTSD"). (R. 1754.)

Terrell also disclosed that Johnson served 18 months in prison after being "involved in an armed robbery with some other friends." (R. 1732.) Terrell testified that Johnson, despite being subjected to physical and sexual abuse while in prison, "maintained good behavior" and was able to qualify for work release. Johnson also completed an anger-management course, an eight-week substance-abuse program, and "reality therapy" while in prison. (R. 1732-33.)

Based on her review of the court-appointed forensic psychologist's evaluation, Terrell determined that Johnson had "a low average IQ" of 89. (R. 1734, 1748.) She also reported that Dr. Robert Bare, the court-appointed forensic psychologist who wrote that evaluation, noted two possible explanations for Johnson's version of the facts "if[, in Dr. Bare's words,] it [were] assumed that [Johnson] was experiencing psychotic

symptoms at the time of the offense." (R. 1750.) First, "it could have been a brief time limited psychotic episode limited to the time frame of the circumstances surrounding the offense" or, second, "it could have been a substance induced psychotic episode that was brief and time limited to the circumstances around the offense." (Id.) In Terrell's opinion, the latter explanation applied to Johnson's offense due to Johnson's admitted use of marijuana before the shooting and long-term PTSD causing Johnson to be paranoid and suspicious, with both contributing to his decision to fire through the door of Room 222. Terrell also testified that drug use was a common flight response for people dealing with PTSD.

Based on her mitigation investigation, Terrell offered the jury 14 mitigating factors "to help the jury impose a punishment less than death." (R. 1759.) Those factors were:

"1. [Johnson] was born to a teenage mother with no experience in being a parent. As a result she was not emotionally available to him from birth. She worked extensively throughout his childhood and teenage years, leaving him with his maternal grandmother much of the time.

"2. [Johnson's] maternal grandmother had serious mental health issues so she was not able to provide emotional support to [Johnson].

"3. [Johnson's] father emotionally and physically abandoned him throughout his life.

12

"4. [Johnson] did not have the benefit of a positive male role model in his life. His father was in and out of state and federal prison reportedly for drug dealing.

"5. [Johnson's] emotional development and attachment ability was damaged as a result of this emotional and physically [sic] abandonment from his family members.

"6. This damage contributed to [Johnson] developing as a quiet, withdrawn child unsure of himself with low self esteem.

"7. [Johnson] was shot at the age of 17. He sustained a traumatic brain/spinal cord injury as a result.

"8. [Johnson] developed PTSD as a result of this shooting and resulting injuries.

"9. [Johnson] never received any therapy/counseling for this injury or resulting PTSD.

"10. [Johnson] was sent to an Alabama prison at age 18 years of age. As a result, he was subjected to attempted physical and sexual assaults by adult inmates.

"11. As a result of those prison experiences, [Johnson's] PTSD worsened significantly.

"12. Once discharged from prison, [Johnson] witnessed sustained community violence making his PTSD even worse.

"13. [Johnson] was in a state of paranoia stemming from his PTSD when he committed the offense for which he has been convicted.

"14. [Johnson's] conduct was good throughout his prison stay. He completed substance abuse, anger management and reality therapy classes. He went to work release and qualified

for an early release after approximately one year in prison. He did not have any disciplinaries for violent behavior."

(C. 1046.) The defense rested after Terrell's testimony, and the circuit court instructed the jury on each of the proposed mitigating circumstances she identified. The circuit court also instructed the jury on the statutory aggravating circumstance that Johnson "knowingly created a great risk of death to many persons." § 13A-5-49(3).

Through a special interrogatory, the jury found beyond a reasonable doubt that Johnson's actions created a great risk of death to many persons. (C. 371.) After considering the evidence of aggravating and mitigating circumstances, the jury returned a verdict of death by a vote of 10-2. After conducting a judicial sentencing hearing, the circuit court sentenced Johnson to death in accordance with the jury's penalty-phase verdict.

Johnson then filed a motion for a new trial (C. 385), which was denied by the circuit court (C. 411). This appeal followed.

Standard of Review

Rule 45A, Ala. R. App. P., as amended effective January 12, 2023, provides:

"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals may, but shall not be obligated to, notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."

This Court will continue to review the entire record for plain error in all cases in which the death penalty has been imposed.

" 'The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal.' Hall v. State, 820 So. 2d 113, 121 (Ala. Crim. App. 1999), aff'd, 820 So. 2d 152 (Ala. 2001). Plain error is 'error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.' Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997), modified on other grounds, Ex parte Wood, 715 So. 2d 819 (Ala. 1998). 'To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So. 2d 199, 209 (Ala. Crim. App. 1998), aff'd, 778 So. 2d 237 (Ala. 2000). 'The plain error standard applies only where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant.' Ex parte Trawick, 698 So. 2d at 167. '[P]lain error must be obvious on the face of the record. A silent record, that is a record that on its face contains no evidence to support the alleged error, does not establish an obvious error.' Ex parte Walker, 972 So. 2d 737, 753 (Ala. 2007). Thus, '[u]nder the plain-error standard, the appellant must establish that an obvious, indisputable error occurred, and he must establish that the error adversely affected the outcome of the trial.' Wilson v. State, 142 So. 3d 732, 751 (Ala. Crim. App. 2010).

'[T]he plain error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."' United States v. Young, 470 U.S. 1, 15, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163 n.14, 102 S. Ct. 1584, 71 L. Ed. 2d 816 (1982))."

DeBlase v. State, 294 So. 3d 154, 182-83 (Ala. Crim. App. 2018). That said,

"[b]ecause plain-error review is now discretionary, it is no longer necessary for this Court to address in its opinions every issue that is subject only to plain-error review and, even if we choose to address those issues, we are not required to engage in the type of in-depth analyses as we have in the past."

Iervolino v. State, [Ms. CR-21-0283, Aug. 18, 2023] 402 So. 3d 844, 862 (Ala. Crim. App. 2023). With these principles in mind, this Court will address each of the arguments Johnson presents on appeal.

## Discussion

On appeal, Johnson presents several issues for our consideration. First, he argues that the circuit court erred when it denied his requested jury instructions on the lesser-included offenses of provocation manslaughter, reckless murder, and reckless manslaughter. Next, Johnson argues that the circuit court's jury instructions on self-defense were plainly erroneous. Johnson alleges the circuit court's penalty-phase jury instruction on the "extreme emotional distress" statutory mitigating

16

circumstance was erroneous, and he challenges the circuit court's exclusion of documentary evidence during the penalty phase. Johnson also challenges the circuit court's admission of several items of evidence, including news articles pertaining to protests surrounding the death of George Floyd, rap lyrics found among Johnson's possessions, autopsy photographs, and what Johnson describes as irrelevant and prejudicial ammunition, firearms, and theft evidence. As explained below, however, none of the issues Johnson presents for our review warrant relief.

I.

Johnson first challenges the circuit court's refusal to instruct the jury on the lesser-included offenses of provocation manslaughter, reckless murder, and reckless manslaughter. Johnson contends that the circuit court's failure to instruct on those offenses impermissibly left the jury with only the choice to convict or acquit Johnson of capital murder. (Johnson's brief at 35-36.)

"'"[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility."'" Williams v. State, 938 So. 2d 440, 444-45 (Ala. Crim. App.

17

2005) (quoting Ex parte Chavers, 361 So. 2d 1106, 1107 (Ala. 1978)). And,

"'"[a] person accused of the greater offense has a right to have the court

charge on lesser included offenses when there is a reasonable theory from

the evidence supporting those lesser included offenses."'" Floyd v. State,

289 So. 3d 337, 416 (Ala. Crim. App. 2017) (quoting Clark v. State, 896

So. 2d 584, 641 (Ala. Crim. App. 2003), quoting in turn MacEwan v. State,

701 So. 2d 66, 69 (Ala. Crim. App. 1997)).

But the "basis of a charge on a lesser-included offense must be

derived from the evidence presented at trial and cannot be based on

speculation or conjecture." Broadnax v. State, 825 So. 2d 134, 200 (Ala.

Crim. App. 2000) (citing Boyd v. State, 699 So. 2d 967 (Ala. Crim. App.

1997)). It is well settled that

> "'"[a] defendant has the right to request a jury
> charge based upon any material hypothesis that
> the evidence tends to establish, and where there is
> a reasonable theory to support a requested charge
> as a lesser-included offense, a trial court's refusal
> to give the charge is reversible error. See Ex parte
> Chavers, 361 So. 2d 1106 (Ala. 1978); Miller v.
> State, 675 So. 2d 534 (Ala. Crim. App. 1996). A
> court may, however, properly refuse to charge on a
> lesser-included offense '(1) when it is clear to the
> judicial mind that there is no evidence tending to
> bring the offense within the definition of the lesser
> offense, or (2) when the requested charge would
> have a tendency to mislead or confuse the jury.'

18

> Chavers, 361 So. 2d at 1107 …. Furthermore, §
> 13A-1-9(b), Ala. Code 1975, states that '[t]he court
> shall not charge the jury with respect to an
> included offense unless there is a rational basis for
> a verdict convicting the defendant of the included
> offense.'"
>
> "'Ryan v. State, 865 So. 2d 1239, 1244 (Ala. Crim. App.
> 2003).'"

Harrison v. State, 398 So. 3d 955, 960-61 (Ala. Crim. App. 2023) (quoting

Culver v. State, 22 So. 3d 499, 525-26 (Ala. Crim. App. 2008)) (emphasis

omitted). Notably, a trial court exercises "considerable discretion in

formulating its jury instructions," Harbin v. State, 14 So. 3d 898, 909

(Ala. Crim. App. 2008), and "'[t]he standard of review for jury

instructions is an abuse of discretion,'" Grant v. State, 324 So. 3d 887,

893 (Ala. Crim. App. 2020) (quoting Petersen v. State, 326 So. 3d 535,

609 (Ala. Crim. App. 2019)).

With those principles in mind, this Court examines each of the

lesser-included offenses Johnson argues the circuit court should have

submitted to the jury.

A.    Reckless Murder

During the charge conference, Johnson requested that the circuit

court instruct the jury on the lesser-included offense of reckless murder,

19

sometimes referred to as depraved-heart murder, on the basis that he was "not trying to intentionally kill anybody" but was, instead, "trying to protect himself and Ms. Tyson from the followers that followed him from Elyton Village." (R. 1540.) A person commits the crime of reckless murder if, "[u]nder circumstances manifesting extreme indifference to human life, he or she recklessly engages in conduct which creates a grave risk of death to a person other than himself or herself, and thereby causes the death of another person." § 13A-6-2(a)(2), Ala. Code 1975.

On appeal, Johnson contends that a reckless-manslaughter charge was warranted because, he says, "the physical evidence shows that [he] shot blindly and without aim." (Johnson's brief at 46 (citing Thomas v. State, 681 So. 2d 265, 267-68 (Ala. Crim. App. 1996).) However, at the time Johnson requested the reckless-manslaughter instruction, the evidence before the circuit court established that Johnson's conduct was in response to, and directed against, Sergeant Williams and other police officers responding to Tyson's 911 calls – the first of which Johnson concedes he dialed and all of which he instructed Tyson to make. Further, the evidence showed that Johnson initially fired through the door after Sergeant Williams knocked, despite claiming that the gunfire he was

responding to came through the window. Even if the circuit court had accepted Johnson's self-serving statements to police officers at face value, his conduct was in response to, and directed against, male voices outside of his door.

Moreover, video footage of the offense showed Johnson firing almost immediately as Sergeant Williams knocked on the door to Room 222, as well as continued firing through the door and window to Room 222 in response to other officers' attempts to approach Sergeant Williams. Afterwards, Johnson told police officers that his actions were the result of an intentional decision to return gunfire at individuals who, he alleged, shot at him first through the window of the room.

Additionally, Johnson maintained at the charge conference that he would pursue self-defense. (R. 1545.) "It is a well accepted principle of law that a claim of self-defense necessarily serves as an admission that one's conduct was intentional." Lacy v. State, 629 So. 2d 688, 689 (Ala. Crim. App. 1993) (citing Harper v. State, 534 So. 2d 1137 (Ala. Crim. App. 1988)).

A reckless-murder charge does not apply when the defendant's acts are directed toward a particular person, or group of individuals, and no

other. See, e.g., Sheffield v. State, 87 So. 3d 607, 625-26 (Ala. Crim. App. 2010) (explaining that the doctrine of universal malice "is intended to embrace those cases where a person has no deliberate intent to kill or injure any particular individual"); Sockwell v. State, 675 So. 2d 4, 26 (Ala. Crim. App. 1993) (citing Northington v. State, 413 So. 2d 1169 (Ala. Crim. App. 1981)); Fisher v. State, 587 So. 2d 1027, 1033 (Ala. Crim. App. 1991) (citing Phelps v. State, 435 So. 2d 158 (Ala. Crim. App. 1983), and Northington, 413 So. 2d 1169) (explaining that, because "the evidence in [this] case clearly indicates that the appellant had a deliberate intent to kill particular individuals," the offense of reckless murder did not apply).

Johnson's theory of defense was that he acted "in fear of his life, the life of Marquisha Tyson," as he was "trying to defend himself and [Tyson] from these followers" -- the four black males Johnson claimed had been following him all day. (R. 1602, 1638.) In his statement to police officers, Johnson twice told them that he had been trying to shoot the people who were shooting at him. Defense counsel argued to the jury that Johnson had "a right under the Constitution of this United States to defend himself on threats of deadly force, burglary" and that he was "not guilty of capital murder" because he was "defending his right." (R. 1638.) As

22

the State correctly observed when Johnson requested an instruction on reckless murder, Johnson's evidence and arguments pertaining to self-defense -- an admission that one's conduct was intentional -- were inconsistent with an instruction on reckless murder. (R. 1539.)

Under slightly different circumstances, this Court explained in Lovell v. State, 521 So. 2d 1346 (Ala. Crim. App. 1987), that

> "'""self-defense and accident are inconsistent defenses, and the defendant alone may not provide the basis for submitting such inconsistent defenses to the jury.'" [State v.] Randolph, 496 S.W.2d [257,] 262 [(Mo. 1973)]; [State v.] Ameen, 463 S.W.2d [843,] 845 [(Mo. 1971)]. "'Taking human life in self-defense is an affirmative, positive, intentional act, and the law does not acknowledge the anomalous doctrine of accidental self-defense.' State v. Whitchurch, 96 S.W.2d 30, 35 (Mo. 1936) (citations omitted)." Wakefield v. State, 447 So. 2d 1325, 1326 (Ala. Crim. App. 1983).'"

521 So. 2d at 1349 (quoting Timmons v. State, 487 So. 2d 975, 986 (Ala. Crim. App. 1986)). Likewise, the law does not recognize the anomalous doctrine of universal-malice self-defense. That is, Johnson's request for a reckless-murder jury instruction on the basis that he recklessly fired out of Room 222, blindly and with universal malice, was wholly inconsistent with his claim to have fired out of Room 222 with a specific intent to injure, kill, or stop the four black males he said were following him and had shot through his motel room's window. Necessarily included in

23

Johnson's claim of self-defense was the implicit assertion that the decision to use deadly physical force was based on a <u>reasonable and honest belief</u> that doing so was necessary to defend himself or another. <u>See</u> § 13A-3-23(a), Ala. Code 1975.

For these reasons, the circuit court did not abuse its discretion when it refused to instruct Johnson's jury on the lesser-included offense of reckless murder because there was no evidence before the court supporting such an instruction. As the Supreme Court noted in <u>Hopper v. Evans</u>, 456 U.S. 605, 611 (1982) (citing <u>Beck v. Alabama</u>, 447 U.S. 625 (1980)), "due process requires that a lesser included instruction be given <u>when the evidence warrants such an instruction</u>." (Emphasis added.) When, as in this case, the evidence does not support such an instruction on reckless murder, considerations of due process do not require the trial court to give such an instruction.

B. <u>Provocation Manslaughter</u>

Johnson also requested an instruction on the lesser-included offense of provocation manslaughter based on his counsel's argument that "[Johnson] was in fear of his followers coming in that door, that he did not have reasonable time for that passion to cool. Therefore,

24

manslaughter, in our opinion, is a reasonable jury charge." (R. 1542.) He maintains that position on appeal, arguing that the "mere appearance" of an imminent assault was sufficient to require the circuit court to instruct the jury on provocation manslaughter, also referred to as heat-of-passion manslaughter. (Johnson's brief at 39 (quoting Cox v. State, 500 So. 2d 1296, 1298 (Ala. Crim. App. 1986).) We disagree.

While Johnson is correct that "the mere appearance of an imminent assault may be sufficient to arouse heat of passion," in order to constitute adequate legal provocation " 'it must be of a nature calculated to influence the passions of the ordinary, reasonable man.' " Cox, 500 So. 2d at 1298 (quoting Biggs v. State, 441 So. 2d 989, 992 (Ala. Crim. App. 1983)). Thus, a trial court "must, as a preliminary question, decide as a matter of law whether offered evidence of provocation has any tendency to prove mitigating circumstances." Id. at 1298 (quoting Commentary to § 13A-6-3, Ala. Code 1975.)

In this case, there was no evidence of an imminent assault presented to the jury sufficient to warrant the requested instruction. Video evidence depicting Johnson and Tyson's arrival and registration at the motel, their subsequent trip to a fast-food restaurant and a

convenience store, and their return to Room 222 failed to reveal any signs or evidence of four black males following them in a vehicle or on foot. When Tyson was asked in her 911 calls to describe the vehicle she claimed the black males had used to follow her around, she was unable to do so (despite the fact Tyson told the 911 operator that two of the black males were in the car at that time). Johnson's own statement to police officers indicated that he had not seen the four black males since arriving in Moody, and his reported actions on returning to Room 222 -- watching TV and smoking marijuana -- were somewhat inconsistent with the belief that four black males who had allegedly been following him all day long were still following him and gathering for an imminent assault. Finally, body-camera and surveillance footage depicting the shooting showed that Johnson fired a barrage of bullets through the door of Room 222 as soon as Sergeant Williams knocked on the door while responding to a 911 call that Johnson dialed.

As the State correctly notes, in some instances "'an accused's self-serving statement may not be sufficient, by itself, to warrant an instruction on a lesser-included offense.'" (State's brief at 29 (quoting Clark, 896 So. 2d at 641).) This is especially true in a case in which the

26

objective evidence is contradictory to the defendant's self-serving statements. One such case was Clark, in which the defendant's self-serving claim that he killed the victim because the victim approached him with a stick was insufficient to warrant a manslaughter instruction. In that case, the physical evidence established that "the stick that Clark claimed [the victim] had wielded as he approached Clark in front of the checkout counter was found propped up on end against the wall in a corner behind the counter." Clark, 896 So. 2d at 642. Likewise, here, the videos tracking Johnson's movements at the motel, fast-food restaurant, and convenience store support the circuit court's exercise of its discretion to deny an instruction on the lesser-included offense of heat-of-passion manslaughter.

It bears repeating that, in his statement to the police, Johnson indicated that he did not see the four black males after he and Tyson reached Moody. Instead, Johnson indicated that he thought he had heard the men's voices outside of his room. Based on what he thought the male voices were saying, Johnson told police officers that he had formed a belief that they were going to attempt to break into his motel room. In this regard, Johnson's statement to law-enforcement officers was

27

relevant to his claim of self-defense, but it did not support an instruction on the lesser-included offense of provocation manslaughter based on the "mere appearance" of an imminent assault.

> "'In discussing what constitutes "imminent assault" in regard to provocation manslaughter, this Court has stated:
>
>> "'"'"'Mere words, no matter how insulting, never reduce a homicide to manslaughter. Manslaughter is the unlawful killing of a human being without malice; that is, the unpremeditated result of passion -- heated blood -- caused by a sudden, sufficient provocation. And such provocation can, in no case, be less than an assault, either actually committed, or menaced under such pending circumstances as reasonable to convince the mind that the accused has cause for believing, and did believe, he would be presently assaulted, and that he struck, not in consequence of a previously formed design, general or special, but in consequence of the passion suddenly aroused by the blow given, or apparently about to be given.' …" <u>Reeves v. State</u>, 186 Ala. 14, 65 So. 160, 161 [(1914)].' <u>Easley v. State</u>, 246 Ala. 359, 362, 20 So. 2d 519, 522 (Ala. 1944). Thus, the mere appearance of imminent assault may be sufficient to arouse heat of passion."
>
> "'<u>Cox v. State</u>, 500 So. 2d 1298 (Ala. Crim. App. 1986). "What constitutes legal provocation is left to the trial judge's interpretation." <u>Gray v. State</u>, 574 So. 2d 1010, 1011 (Ala. Crim. App. 1990) (citing <u>Schultz v. State</u>, 480 So. 2d 73, 76 (Ala. Crim. App. 1985)).'"

Petersen, 326 So. 3d at 610 (quoting Spencer v. State, 201 So. 3d 573, 596-97 (Ala. Crim. App. 2015)). Applying these principles to this case, we note that Johnson's request for an instruction on provocation manslaughter was based on "mere words" that he claimed to have heard spoken outside of his room. Under such circumstances, the circuit court acted well within its discretion when it declined to instruct the jury on the lesser-included offense of provocation manslaughter.

### C. Reckless Manslaughter

Johnson also challenges the circuit court's refusal to instruct the jury on the lesser-included offense of reckless manslaughter. At trial, Johnson appears to have requested an instruction on reckless manslaughter pursuant to a theory of voluntary intoxication. (C. 1057-58; R. 1542.) In denying Johnson's request, the circuit court noted that although it had "heard [Johnson's] statement that said I smoked plain weed," it had not "seen any evidence of intoxication." (R. 1571-72.) When Johnson attempted to argue the point further, the circuit court responded that there was "no evidence he took half a to[k]e or how much was in it, the strength of it, or that he smoked the whole bag. There is none of that." (R. 1572.) We agree with the circuit court that the limited evidence of

drug use in this case was insufficient to warrant a jury instruction on reckless manslaughter under a voluntary-intoxication theory.

On appeal, however, Johnson abandons that claim and argues instead that "the physical evidence shows that Mr. Johnson shot blindly and without aim, which support[ed] a reckless manslaughter charge." (Johnson's brief at 46.) He further argues that his "own statements were also evidence from which a jury could have found him guilty of reckless murder or manslaughter, as he confessed to the police that he frantically shot without aim." (Id. at 47.) Because Johnson did not present this argument to the circuit court, relying instead on a theory of voluntary intoxication, we review his claim solely for plain error. See Rule 45A, Ala. R. App. P.

Under the facts of this case, we hold that the circuit court did not abuse its discretion when it refused to instruct the jury on the lesser-included offense of reckless manslaughter. As noted previously, Johnson explicitly represented to the circuit court that he was invoking self-defense. (R. 1545.) Thus, Johnson represented to the circuit court that he was claiming to have intentionally and justifiably defended himself against black males attempting to unlawfully enter Room 222 and, in the

30

process of doing so, accidentally killed Sergeant Williams or that he specifically targeted Sergeant Williams believing that Sergeant Williams was attempting to unlawfully enter his motel room. Either way, Johnson's conduct, under a claim of self-defense, was part of the same conduct that resulted in the death of Sergeant Williams. The same conduct cannot be both intentional and reckless. See Peterson v. State, 388 So. 3d 716, 730 (Ala. Crim. App. 2023).

Under these circumstances, the circuit court did not plainly err when it refused to instruct the jury on reckless manslaughter under a theory that Johnson did not advocate at trial. Consequently, Johnson is not entitled to relief as to this claim.

II.

As noted previously, Johnson pursued a theory of self-defense at trial. (R. 1545.) Therefore, the circuit court instructed Johnson's jury as follows:

> "One of the issues asserted by the defendant in this case is self-defense. A person may use deadly physical force and is legally presumed to be justified in using deadly physical force in self-defense or in the defense of another person if the person reasonably believes that another person is using or about to use physical force against an occupant of a dwelling while committing or attempting to commit a burglary of such dwelling. Next one. In the process of unlawfully entering or

31

has unlawfully and forcefully entered a dwelling, residence, business property, or occupied vehicle … or attempting to remove or forcibly remove a person against his will from a dwelling, residence, business property, occupied vehicle when the person has a legal right to be there, and provided that person is using deadly force, knows or has reason to believe that an unlawful and forcible entry or unlawful and forcible act is occurring. <u>The legal presumption that a person using deadly force is justified does not apply if the person who uses defensive force is engaged in an unlawful activity or using the dwelling, residence, or occupied vehicle to further an unlawful activity. Next. The person against whom the defensive force is used is a law enforcement officer acting in the performance of his or her official duties.</u> A reasonable belief is a belief formed in reliance upon reasonable appearances. It is a belief not formed recklessly or negligently. The test of reasonableness is not whether the defendant was correct in his or her belief but whether the belief was reasonable under the circumstances existing at that time."

(R. 1679-81 (emphasis added).) On appeal, Johnson -- correctly noting that a person may defend themselves even if engaged in unlawful activity -- argues that the emphasized portion of this instruction confused the jury into believing that acts of self-defense undertaken pursuant to § 13A-3-23(a)(1) or (2), Ala. Code 1975, "'do[] not apply' if the defendant was 'engaged in an unlawful activity' or used force against 'a law enforcement officer.'" (Johnson's brief at 52.)

32

Johnson, however, did not object to the circuit court's jury instructions before the jury retired to deliberate. (R. 1686.) Rule 21.3, Ala. R. Crim. P., provides that no party

> "may assign as error the trial court's giving or failing to give a written jury instruction, or the giving of an erroneous, misleading, or incomplete or otherwise improper oral charge, unless the party objects thereto before the jury retires to consider its verdict, stating the matter to which he or she objects and the grounds of the objection."

Because Johnson was sentenced to death, his failure to comply with Rule 21.3 does not preclude this Court's consideration of this claim under the plain-error standard of review. See Rule 45A, Ala. R. App. P.

"A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts in the case." Ingram v. State, 779 So. 2d 1225, 1258 (Ala. Crim. App. 1999) (citing Raper v. State, 584 So. 2d 544 (Ala. Crim. App. 1991)). "'When reviewing a trial court's instructions, "'the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.'"'" Jones v. State, 217 So. 3d 947, 960 (Ala. Crim. App. 2016) (quoting Williams v. State, 795 So. 2d 753, 780 (Ala. Crim. App. 1999), quoting in turn Self v. State, 620 So. 2d 110, 113 (Ala. Crim. App. 1992), quoting in

33

turn <u>Porter v. State</u>, 520 So. 2d 235, 237 (Ala. Crim. App. 1987)). In this case, considering the entirety of the circuit court's jury instruction on self-defense, we find no plain error.

Section 13A-3-23(a)(5) provides that a person "may use deadly physical force, and is legally presumed to be justified in using deadly physical force in self-defense or the defense of another person," if that person believes another is "[i]n the process of unlawfully and forcefully entering … a dwelling [or] residence … or is attempting to remove a person against [their] will from any dwelling [or] residence … provided that the person using the deadly physical force knows or has reason to believe that an unlawful and forcible entry or unlawful forcible act is occurring." But such a legal presumption does not apply under circumstances where the person "who uses defensive force is engaged in an unlawful activity or is using the dwelling [or] residence … to further an unlawful activity" or where the person "against whom the defensive force is used is a law enforcement officer acting in the performance of his or her official duties." § 13A-3-23(a)(5)c and d. The circuit court's instruction on this provision was a correct statement of the law.

Nonetheless, Johnson argues that the instruction failed to clearly explain that the exceptions to § 13A-3-23(a)(5) were inapplicable to acts of self-defense carried out under subsections (a)(1) and (2). Even if this issue were not subject to plain-error review, we would conclude that any possible confusion created by the circuit court's jury instruction on self-defense was harmless. "Any error in charging on the doctrine or elements of self-defense is harmless where the evidence shows without conflict that the defendant could not invoke that defense." Raines v. State, 455 So. 2d 967, 975 (Ala. Crim. App. 1984) (citing Brewer v. State, 160 Ala. 66, 49 So. 336 (1909), and Owen v. State, 418 So. 2d 214, 223 (Ala. Crim. App. 1982)).

As to § 13A-3-23(a)(1) and (2), those subsections require that a person employing deadly physical force "reasonably believe" that the person against whom such force is employed is engaging in conduct that falls within the statute's scope. As this Court explained in King v. State, 478 So. 2d 318 (Ala. Crim. App. 1985):

> "[A] belief that [an] assailant is going to use unlawful deadly physical force must be both honestly entertained and reasonable.
>
> "'The law requires that a belief of imminent peril and urgent necessity to slay in self-defense,

35

though it may be based on appearances, must be both well-founded and honestly entertained. <u>Williams v. State</u>, 161 Ala. 52, 59, 50 So. 59 (1909). A merely "honest" belief, unless a reasonable one, that the killing was necessary, will not make it justifiable.

"'"<u>It is not an honest, but a reasonable belief, that justifies. An honest belief may not be a reasonable belief; it may be the offspring of fear, alarm or cowardice, or it may be the result of carelessness, and irrational. A reasonable belief, generated by the attendant circumstances -- circumstances fairly creating it -- honestly entertained, will justify a homicide; but not an irrational belief, however honest it may be.</u>"' <u>Holley v. State</u>, 75 Ala. 14, 19 (1883)." <u>Howard v. State</u>, 420 So. 2d 828, 832 (Ala. Cr. App. 1982).

"'<u>The question is not merely what the defendant believed, but also, what did he have the right to believe</u>.' Ala. Code 1975, § 13A-3-23 Commentary."

478 So. 2d at 320 (emphasis added). Although the circuit court provided Johnson the opportunity to argue self-defense under subsections (a)(1) and (2), there was no evidence presented from which the jury could have found that Johnson had an <u>honest and reasonable belief</u> that Sergeant Williams was "using or about to use unlawful deadly physical force" or was "using or about to use physical force against an occupant of a dwelling while committing or attempting to commit a burglary of such dwelling" at the time he knocked on the door of Room 222. Consider, for

example, the fact that Johnson never claimed to have seen the individual he shot at in self-defense and that the shooting of Sergeant Williams was captured by multiple video cameras. Cf. Raines, 455 So. 2d at 974 (citing Consford v. State, 15 Ala. App. 627, 74 So. 740 (1917)) (explaining that it "is not an invasion of the province of the jury for the court to determine whether, under the facts proven, the defendant may set up self-defense").

Multiple videos established that Johnson fired immediately when Sergeant Williams knocked on the door of Room 222, which was after Johnson had dialed 911 and instructed Tyson to request that police officers be sent to his room. The video evidence at trial corroborated Johnson's admission that he had not seen the four black males since his arrival in Moody, because those videos established Johnson was not being followed at the motel, the gas station, or the fast-food restaurant. Further, Johnson's claim that he opened fire after gunshots were fired into his room was shown to be false through the video evidence. Under these circumstances, any confusion regarding the applicability of § 13A-3-23(a)(1) or (2) created by the circuit court's instruction on self-defense was harmless, because "the evidence shows without conflict that the

37

defendant could not invoke that defense" under either of those subsections. Raines, 455 So. 2d at 975.

Johnson's claim of self-defense hinged on establishing that he reasonably believed that Sergeant Williams's knock on the door of Room 222 was the start of a "process of unlawfully and forcefully entering" the room, a theory governed solely by § 13A-3-23(a)(5). The two exceptions Johnson challenges applied to this subsection of the self-defense statute, meaning that there is no possible prejudice in this case. See Rule 45, Ala. R. App. P. Consequently, Johnson is due no relief as to this claim.

## III.

Johnson next challenges the circuit court's admission of what he describes as "prejudicial hearsay news articles describing Birmingham protests over George Floyd's death by police," claiming that "the State attempted to link Mr. Johnson to the anti-police protests taking place across the county in the wake of George Floyd's death."[3] (Johnson's brief

---

[3]"George Floyd, a black man, died in May 2020 while being arrested by Derek Chauvin, a white police officer. Floyd's death received national media coverage and sparked nationwide riots and protests. Chauvin was later convicted of murdering Floyd and was sentenced to 270 months' imprisonment." Flickinger v. King, [Ms. SC-2024-0153, Aug. 22, 2025] ___ So. 3d ___, ___ n.3 (Ala. 2025) (citing State v. Chauvin, 989 N.W.2d 1 (Minn. Ct. App. 2023)).

at 58-59.) Johnson, however, did not object to the admission of those news articles at trial. We review this claim, therefore, solely for plain error. See Rule 45A, Ala. R. App. P.

The record on appeal does not support Johnson's argument that the articles were admitted into evidence to "link" Johnson to protests occurring in the wake of George Floyd's death. Instead, the record on appeal indicates that those articles were introduced for a different purpose, as shown by the following exchange during trial:

> "[PROSECUTOR]: Thank you. [Investigator Hurst], there has been some testimony about events that were going on in our country and in particular <u>in Birmingham there has been some discussion over a curfew</u>.
>
> "Investigator Hurst, I would like to show you what's been marked as State's Exhibit Number 525 and State's Exhibit Number 526, and ask if you recognize those documents?
>
> "A. Yes, sir, I do.
>
> "Q. And what are they?
>
> "A. <u>This is a curfew ordered by the Mayor, actually that took effect the day before this incident happened</u>.
>
> "Q. Took effect the day before June 2nd?
>
> "A. Yes, sir.
>
> "Q. And that is a newspaper article?

"A. It is. Actually, it's two different newspaper articles.

"Q. Actually, Channel 13 is TV.

"A. Right.

"Q. What does the next one show?

"A. <u>This one just shows the date that the curfew would be -- City of Birmingham from 7:00 p.m. to 6:00 a.m. Said curfew was going into effect today, Mayor Randall Woodfin, Monday afternoon</u>.

"Q. You didn't alter or change these in any way?

"A. I did not, no, sir.

"Q. This is just two periodicals that shows what's going on in the world, right?

"A. Yes, sir.

"[PROSECUTOR]: Your Honor, we would offer 525 and 526.

"THE COURT: 525 and 526 have been marked and offered by the State.

"[DEFENSE COUNSEL]: <u>No objection</u>.

"THE COURT: <u>No objection by the defense</u>. 525 and 526 are admitted.

"(State's Exhibit Numbers 525 and 526 admitted.)"

(R. 1114-15 (emphasis added).)

Whether to admit or exclude evidence is a matter within the sound discretion of the trial court, and its determination on such an issue "'will not be reversed except upon a clear showing of abuse of discretion.'" Garzarek v. State, 153 So. 3d 840, 845-46 (Ala. Crim. App. 2013) (quoting Ex parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000)). Furthermore, "'[a] fact is admissible into evidence if it has any probative value, however slight, upon a matter in the case.'" Primm v. State, 473 So. 2d 1149, 1157 (Ala. Crim. App. 1985) (quoting C. Gamble, McElroy's Alabama Evidence § 21.01(1) (3d ed. 1977)).

During its case-in-chief, the State introduced evidence establishing that Johnson and Tyson resided in an apartment in Birmingham, the municipality that imposed the curfew that was the subject of the articles composing State's Exhibits 525 and 526. That evidence also included Johnson's statement to police in which he identified the curfew as one of the reasons he and Tyson had traveled to Moody.

In his opening brief, Johnson concedes that "the articles were offered to prove the truth of the 'curfew' imposed in Birmingham as a result of the [George Floyd] protests" but maintains that the articles were inadmissible hearsay, were irrelevant, or that the prejudice resulting

from their admission outweighed any possible relevance attributable to them. (Johnson's brief at 60-62.) We see no prejudice, however, from the articles' admission into evidence. For example, the title of the article identified as State's Exhibit 525 was "Birmingham's curfew order: Here's what it means" (C. 980), while the title of the article identified as State's Exhibit 526 was "Protests turn violent in downtown Birmingham, state of emergency declared" (C. 981). This Court has reviewed the two exhibits, and there is nothing prejudicial or inflammatory in either article. Both articles focused on the City of Birmingham's decision to enact a nightly curfew, a curfew that Johnson and Tyson would have been subject to but for their decision to stay at the motel in Moody.

More importantly, the State did not attempt to draw a connection between Johnson's actions and the death of George Floyd when it introduced the articles or during its argument at the close of the guilt phase. (R. 1580-92;1639-68.) Indeed, the record reflects that the State argued the following about motive:

> "Ladies and gentlemen, one thing that I don't think you will hear from Judge Seay is the word motive. Why? Because the State, our law, we don't have to prove motive. But as a human being and we see this evil and we want to know why. We have given you our theory but our theory is not evidence. You don't

42

have to believe our theory, but you do have to believe the evidence and follow the law."

(R. 1661.)

Additionally, Johnson relied on those articles as part of his defense. In closing arguments, Johnson's counsel referred to the articles noting that they "talk[] about that curfew" that "was effective or mandated, for lack of a better term, by the Mayor of Birmingham" and further noting that the curfew was the reason Johnson and Tyson left Birmingham and traveled to Moody. (R. 1606.)

On the record before this Court, there was no error, much less plain error, in the circuit court's admission of State's Exhibits 525 and 526. Both the State and Johnson used those articles to establish that Johnson's movements on the day of the murder were likely influenced by the City of Birmingham's enactment of the curfew, and for no other reason. Accordingly, Johnson is not entitled to any relief as to this claim. See Rule 45, Ala. R. App. P.

IV.

Johnson's fourth argument challenges the circuit court's admission into evidence of the contents of writings found during a search of Tyson's car. The writings were recovered from a bag identified and admitted,

43

without objection, as State's Exhibit 115. (R. 1064.) After the exhibit was admitted into evidence, Investigator Joey Brown was questioned about its contents:

"[PROSECUTOR]: If you would open up that box and read us some of them. Tell us what this is and read it out loud to the jury.

"A. So first of all, let me say these are not my words, so just know that. This is just a small notebook and it says 'fuck the police' and 'street name Pistol Pete.'

"Do you want me to read all of this or just --

"Q. You can just read out anything -- if there is anything related to guns, police, or anything like that.

"A. 'When you're broke home' -- I can't read that -- 'like a maniac. Poor white folks' Can't read that. 'They kids parents.'

"Q. Is there any writing on the back of that paper?

"A. 'Good-bye to the good guy, hello to the bad one. Good night to the peace. Good morning to the madness. When I got my peace, I was gladly the happiest man on the planet. I'm a nigga with a gun the white man can't stand. The police, the modern day Ku Klux Klan. Being black in this land is a' -- I think that's -- 'distortion. Got to keep your arms at mother fucking hands.'

"'The real nigga like me, you that guy telling lies on the guy like me. I'm the guy that spark that fire, leave you dead in the street.' This says 'murder scene,' but I can't see where it's in any type of sentence relating to it. It says 'murder scene.' 'A little hemp seed an a little bit more weed eases my mind and

44

sets me free. It's not the land of the free. It's not the way it supposed to be. This country is not for me.'

"'You know too many people get shot these days. Everybody feeling like' -- looks like PUC -- 'PUC these days. No matter if you are a thug or not these days it's shoot or either get shot these days. All I remember seeing is a lot of weed. I'm not at ease. Got my AR-15. I ain't on no fling.'

"'I got a whole lot of weed in my lap. I got' -- it looks like – 'ghetto babies. I got bud seeds. I'm about to lose my cool. This cool -- I'm about to lose my cool. This cool I got I'm about to lose it. I was raised in the valley of cut throats. It's a' -- looks like -- 'parade in the city with the gun smoke. Better keep your shit loaded and real close. High as hell, hot railing everybody.'

"'The richest man alive is a fucking drug dealer. Selling dope to all. Neutralize/kill. Got to stick to the code. Ain't got a Miller. Try and get one. Ain't got' -- I guess it's 'none, but a big ass gun.' It looks like 'smearing me old big ass blunt. I gun down an unarmed man. This that broke glass pot, this crack shit, blow it, get it. Look at these bears, look at these snakes, look at these haters. Need some to hate. I keep the 40 on me in the daylight. AR-15 in the night.'

"'I must have been high' -- looks like -- meant. 'SKS 75 round clip chopper this big, 50 round on my hip. If you ain't from around here better get from here. Better get from around here if you don't want to see somebody get killed around here. This military' -- I can't read that word -- 'brought to you from the swamp. I know ni--er rob the trillion far more than marijuana, 40 Glocks by the box.' I can't read what's before it, but it looks like 'muster, break the code. Break the' -- I can't read that -- 'Chopper, break the Chopper out. Break your ass off.' It looks like 'is the fight for freedom Dr. King. If we are wrong justice is a lie.'

"Q. And, Investigator Brown, would you agree there's lots more papers in here?

"A. There is so much more."

(R. 1064-67.) Because Johnson did not object to the admission of State's Exhibit Number 115, or to the testimony of Investigator Brown as to the content of the writings contained in that exhibit, we review this claim solely for plain error. See Rule 45A, Ala. R. App. P.

Testimony at trial established that one of the weapons recovered from Tyson's vehicle was purchased by Johnson (R. 1038), and a paycheck stub and Form W-2 in Johnson's name were also recovered (R. 1086). Surveillance footage depicted Johnson driving Tyson's Ford Taurus, which contained the writings, to the motel. Once at the motel, Johnson retrieved an orange bookbag from the back seat of Tyson's vehicle before walking to Room 222. Other evidence established that Johnson used Tyson's car to pick up food at a local restaurant and to purchase cigars from a nearby gas station.

Whether to admit or exclude evidence is a matter within the sound discretion of the trial court, and its determination on such an issue "'will not be reversed except upon a clear showing of abuse of discretion.'" Garzarek, 153 So. 3d at 845-46 (quoting Ex parte Loggins, 771 So. 2d at

46

1103). Further, "'[a] fact is admissible into evidence if it has any probative value, however slight, upon a matter in the case.'" Primm, 473 So. 2d at 1157 (quoting C. Gamble, McElroy's Alabama Evidence § 21.01(1) (3d ed. 1977)). In addition, the requirement "of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Rule 901(a), Ala. R. Evid.

This evidence possessed probative value that warranted its submission to the jury for its consideration. Johnson was accused of killing an on-duty Moody police officer, after dialing 911 and requesting that police officers respond to his room, and the writings found in the car he used to travel to Moody shed possible insight into Johnson's state of mind. "'[B]ecause intent is a state of mind, it is rarely susceptible of direct or positive proof.'" Flynn v. State, 409 So. 3d 80, 98 (Ala. Crim. App. 2024) (quoting Pilley v. State, 930 So. 2d 550, 564 (Ala. Crim. App. 2005)). But when, as in this case, the State obtains evidence that potentially represents positive proof of a defendant's state of mind, its submission to the jury is undoubtedly relevant as to the element of intent.

In <u>Powell v. State</u>, [Ms. CR-20-0727, May 3, 2024] ___ So. 3d ___

(Ala. Crim. App. 2024), this Court explained:

"'Rule 901(a), Ala. R. Evid., provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "A writing may be authenticated by evidence of the contents or substance of the writing when taken in conjunction with the circumstances out of which it was written." Charles W. Gamble and Robert J. Goodwin, <u>McElroy's Alabama Evidence</u> § 111.01(1) (6th ed. 2009). <u>See also</u> Rule 901(b)(4), Ala. R. Evid. (providing that a piece of evidence may be properly authenticated by its "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances").

"'In <u>Washington v. State</u>, 539 So. 2d 1089 (Ala. Crim. App. 1988), this Court held:

"'"'Before a letter is received in evidence, it is necessary to lay a foundation establishing its identity and authenticity, as by introducing proof as to the source of the letter or proof of the handwriting or signature of the sender.' <u>Howard v. State</u>, 347 So. 2d 574, 575 (Ala. Crim. App. 1977). Here, there was no proof regarding the defendant's handwriting and the letters bore no signature. Nevertheless, even 'unsigned letters may be received in evidence if properly connected with a person as being his actual letter, by the introduction of competent evidence showing it to be so.' <u>Silva v. Exchange Nat'l Bank</u>, 56 So. 2d 332, 335-36 (Fla. 1951).

"'"The question before us is whether the letters were 'properly connected' with the

48

defendant even though no witness saw him write the letters or place them in his truck for delivery. 'The authenticity of a letter may be established in more than one way. It may be established directly by proof of handwriting or by indirect or circumstantial evidence.' Casto v. Martin, 159 W. Va. 761, 230 S.E.2d 722, 727 (1976); Maynard v. Bailey, 85 W. Va. 679, 102 S.E. 480 (1920); Deaderick v. Deaderick, 182 Ga. 96, 185 S.E. 89 (1936).

"'"....

"'"Finally, although 'the mere contents of a written communication ... are of themselves usually not sufficient evidence of genuineness,' 7 Wigmore, Evidence § 2148 at 746, '[t]he contents of a writing may be critical in establishing admissibility. When the contents of a letter are of such nature that the letter could not have passed between any parties except the purported writer and the person to whom it was delivered, the letter is admissible.' Casto v. Martin, 230 S.E.2d at 727 (footnotes omitted). See also People v. Adams, 162 Mich. 371, 127 N.W. 354, 360 (1910) (letters purporting to come from defendant to witness, referring to a subject previously discussed by them, were admissible although it was not shown that he signed or sent them).

"'"....

"'"The sufficiency of the predicate required for the authentication of letters is largely within the discretion of the trial judge, and will be reviewed only for an abuse of discretion. Casto v. Martin, 230 S.E.2d at 727; State v. Huffman, [141 W.Va. 55,] 87 S.E.2d [541] at 554 [(1955)]. We find

49

> no abuse of discretion here. The letters were properly admitted for the jury to determine their actual authorship. <u>Maynard v. Bailey</u>, 102 S.E. at 482."

"'539 So. 2d at 1097-99.' "

___ So. 3d at ___ (quoting <u>Capote v. State</u>, 323 So. 3d 104, 122 (Ala. Crim. App. 2020)). Considering the previously discussed facts, the circuit court did not abuse its discretion, much less to the level of plain error, when it admitted into evidence the documents recovered from Tyson's car.

Finally, although Johnson argues that the admission of this evidence violated "federal law," the entirety of his argument relates to admissibility under the Alabama Rules of Evidence. Although Johnson cites <u>Darden v. Wainwright</u>, 477 U.S. 168 (1986), and <u>Turner v. Murray</u>, 476 U.S. 28 (1981), the holdings of those decisions have no direct application to the issue he presents for our review. In <u>Darden</u>, the Court addressed the propriety of a prosecutor's closing argument, through the procedural context of a habeas corpus action. 477 U.S. at 179-82. <u>Turner</u>, on the other hand, held "that a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." 476 U.S. at 36-37. Neither of those decisions has direct application to Johnson's challenge

50

to the circuit court's decision to admit documentary evidence and testimony in the absence of an objection by the defendant or in the face of a defendant's subsequent use of the same exhibit.

V.

Johnson next argues that the circuit court erred when it allowed the State to elicit testimony that two colored bandanas, attached to weapons recovered from Tyson's Ford Taurus, may have been indicative of gang activity. Johnson's argument is based on testimony elicited during the State's questioning of Investigator Brown.

While testifying about the weapons recovered from Tyson's Ford Taurus, Investigator Brown identified a Mossberg 500 shotgun "with a red bandana […] tied around the end" (R. 1035), and identified a photograph of the shotgun "with the red bandana on it" (R. 1042). Investigator Brown also identified a Kel-Tec rifle with a green bandana attached to it that was recovered from Tyson's car. (R. 1043, 1050-51.) Johnson's argument centers on the following testimony about these items:

> "[PROSECUTOR]: I show you what's marked as State's Exhibit 118. See if you can identify that.
>
> "[INVESTIGATOR BROWN]:    This is labeled a shotgun.

51

"Q. If you would open up that box, please. Tell the jury what's inside, please.

"A. This is a Mossberg 500 .12 gauge shotgun with a red bandana.

"....

"Q. And is this that long shotgun from the photograph you showed with the red bandana tied around the end?

"A. Yes.

"Q. Do you know why the red bandana is tied around the end?

"A. Most of the time when you have a bandana that's colored and it is displayed in that fashion, it is gang related."

(R. 1048-49.) Johnson did not object to the State's questions or Investigator Brown's responses, nor did he request any curative instruction from the circuit court. Because Johnson did not object to the admission of this testimony at trial, we review his claim solely for plain error. See Rule 45A, Ala. R. App. P.

Rather than object, defense counsel addressed the issue through his cross-examination of Investigator Brown:

"[DEFENSE COUNSEL]: This, for the benefit of the ladies and gentlemen of the jury, is one weapon in State's 121 that bears the green bandana. This weapon here, the box that it's contained in was offered as an exhibit and accepted into evidence as State's 118. That would be what kind of weapon?

52

"[INVESTIGATOR BROWN]: That is the Mossberg.

"Q. .12 gauge?

"A. Yes. Mossberg 500.

"Q. Mossberg 500. For the benefit of the ladies and gentlemen of the jury, this is the second weapon or the other weapon with the bandana on it, red in particular. Have you noticed the laser sight on this weapon, Investigator Brown?

"A. Yes, sir. It has a laser sight on it.

"Q. Do you know if there is a laser sight on that weapon?

"A. Yes, sir.

"Q. Yes, sir?

"A. Yes, sir. There is a laser sight.

"....

"Q. What if I asked you this question -- and thank you for your answer on that. If you were to put a new battery in this and it was operable and worked, if that was a green laser sight it would match this green bandana, wouldn't it?

"A. If it was a green sight, yes.

"Q. If this one here was a red laser sight, it would match a red bandana, wouldn't it?

"A. It would."

(R. 1076-78.) The shotgun barrel with the red bandana was referenced once more during Johnson's cross-examination of Investigator Randy Hurst, without any speculation as to the purpose or meaning of the bandana. (R. 1231.)

During the State's closing argument, a prosecutor referenced this testimony and argued, without objection, as follows:

> "The testimony is that they went to Auto Zone because he must have left one gun, one with the red bandana, this one right here (indicating), a shotgun. That's the testimony. And I guess in the course of riding around with Popeye and BooBoo he realized that he left his Mossberg shotgun <u>that has a laser</u>. The defense is making a big deal about what was said about the bandana, <u>but we didn't say he was in a gang</u>. <u>Joey Brown didn't say he was in a gang</u>. The question of Joey Brown was what do bandanas typically indicate, and his response was gang, but now it's turned into we are saying he's a gang member. <u>That's not the evidence and that's not what we said</u>. Listen, I have no idea what color that laser is. I don't care. You put a laser on an assault weapon to point it so your projectile hits what you intend to kill. And if you can't remember what color laser it is and you have to tie a bandana to it, who cares. <u>Nobody says he is in a gang</u>. But there is the bandanas. We didn't do it. That's found in his car. He did it. He's the one with assault weapons with lasers to point at people to kill them, not us. We didn't create this evidence."

(R. 1643-44 (emphasis added).)

In support of this claim, Johnson relies on <u>Darden</u>, in which the United States Supreme Court found no denial of the defendant's right to

54

a fair trial resulting from a prosecutor's argument that "deserve[d] the condemnation it … received from every court to review it," because the argument "did not manipulate or misstate the evidence, [and] did [not] implicate other specific rights of the accused" and because "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense." Id., 477 U.S. at 182. Unlike the argument described in Darden, the prosecutor's argument in this case was not objectionable and is not deserving of condemnation. Instead, the prosecutor at Johnson's trial clearly articulated that the State was offering no argument or evidence that Johnson belonged to a gang. Further, as was the case in Darden, the "weight of the evidence against [Johnson] was heavy." Id.

Contrary to Johnson's presentation of this claim, the testimony at trial was not that "Johnson belonged to a gang." (Johnson's brief at 73.) Moreover, considering the manner in which defense counsel cross-examined Investigator Brown to inject a second explanation for the colored bandanas attached to the weapons recovered from Tyson's vehicle, the complete absence of any other testimony, argument, or references to possible gang activity involving Johnson, and the

prosecutor's clear assertion that the State was not suggesting any such gang involvement, we cannot conclude that the challenged testimony constitutes an "'"error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the … proceedings."'" Iervolino, 402 So. 3d at 862 (quoting DeBlase, 294 So. 3d at 182, quoting in turn, Ex parte Trawick, 698 So. 2d 162, 167 (Ala. 1997)). Accordingly, Johnson is due no relief as to this claim.

## VI.

For his sixth argument on appeal, Johnson contends that the circuit court's penalty-phase jury instruction on the statutory mitigating circumstance of "extreme mental or emotional disturbance" improperly instructed the jury that it could not consider extreme emotional distress in mitigation. Johnson's argument is based on the following portion of the circuit court's penalty-phase charge:

"Mitigating circumstances. The defendant is allowed to offer any evidence in mitigation. That is evidence that indicates or tends to indicate that the defendant should be sentenced to life without the possibility of parole instead of death. The defendant does not bear the burden of proof in this regard. The defendant must only present the evidence. The laws of this State provide that mitigating evidence shall include but not be limited to the following enumerated mitigating circumstances. I am going to read those 14 plus two, 16, to you. Number 1, under 13A-5-51(1), no significant history of

56

criminal activity. Number 2, extreme mental -- which is under 13A-5-51(2) -- <u>no extreme mental or emotional disturbance</u>. Number 3 …"

(R. 1826 (emphasis added).) Johnson did not object to the trial court's jury instructions, so we review this claim solely for plain error. <u>See</u> Rule 45A, Ala. R. App. P.

"A trial court has broad discretion in formulating its jury instructions, providing those instructions accurately reflect the law and the facts in the case." <u>Ingram</u>, 779 So. 2d at 1258 (citing <u>Raper</u>, 584 So. 2d 544). "'When reviewing a trial court's instructions, "'the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.'"'" <u>Jones</u>, 217 So. 3d at 960 (quoting <u>Williams</u>, 795 So. 2d at 780, quoting in turn <u>Self</u>, 620 So. 2d at 113, quoting in turn <u>Porter</u>, 520 So. 2d at 237).

The challenged portion of the circuit court's instruction appears to be a verbal inaccuracy or palpable slip of the tongue. "'"[A] mere verbal inaccuracy in a charge, which results from a palpable slip of the tongue, and clearly could not have misled or confused the jury is not reversible error."'" <u>Lindsay v. State</u>, 326 So. 3d 1, 47 (Ala. Crim. App. 2019)

(quoting <u>Graham v. State</u>, 242 Ga. App. 361, 362, 529 S.E.2d 641, 644 (2000), quoting in turn <u>Fruhling v. State</u>, 233 Ga. App. 544, 545, 505 S.E.2d 47, 49 (1998)).

During the penalty-phase closing arguments, Johnson's counsel argued that Johnson was claiming the statutory mitigating circumstance of extreme mental or emotional disturbance. (R. 1817.) After the circuit court gave the challenged instruction, it went on to charge the jury on a number of nonstatutory mitigating circumstances requested by Johnson and further instructed the jury that the "laws of this State further provide that mitigating circumstances shall not be limited to those I just listed, but shall also include any aspect of the defendant's character or background, any circumstances surrounding the offense, and any other relevant mitigating evidence that the defendant offers as support" for a sentence of life imprisonment without the possibility of parole. (R. 1828.) The circuit court also instructed the jury that if Johnson put forth evidence in mitigation, "the State shall have the burden of disproving the factual existence of the disputed mitigation evidence by the preponderance of the evidence." (<u>Id.</u>)

Considering the circuit court's penalty-phase instructions as a whole, we conclude that the circuit court's slip of the tongue did not rise to the level of plain error because, in context, the circuit court's instructions explained the purpose of mitigating evidence and the mitigating circumstances put forth by Johnson.[4] Johnson is not entitled to any relief as to this claim.

## VII.

Johnson next challenges the circuit court's refusal, during the penalty phase, to admit the report of Dr. Robert Bare -- the court-appointed forensic psychologist -- through the testimony of Joanne Terrell, a clinical social worker and Johnson's mitigation expert. (Johnson's brief at 81-86.) Johnson attempted to have Dr. Bare's report admitted through Terrell's testimony, as follows:

"[DEFENSE COUNSEL]: What else, Ms. Terrell, did you rely on?

_____

[4]Additionally, if the circuit court's instruction was understood as given -- i.e., that the second statutory mitigating circumstance was the presence of "no extreme mental or emotional disturbance" -- it is unclear how prejudice would arise under such a lessened standard. And, inasmuch as Johnson argued in favor of a finding of the presence of an extreme mental or emotional disturbance, the jury's failure to ask any questions about the challenged language suggests that there was no confusion resulting from this portion of the circuit court's instruction.

"A. I reviewed the psychological report that the prosecution's psychologist, Dr. Bare, wrote in evaluating him.

"(Defendant's Exhibit Number 19 marked for identification.)

"Q. Let me show you what's marked as Defendant's 19. Ms. Terrell, in Defendant's 18, your report, you just testified that you relied on Dr. Bare's final report dated September 19, 2023. Is your reliance on that report -- what is the purpose of your reliance on his report?

"A. It helped me to solidify my theory and evaluation that, in fact, he did have a low average I.Q. I suspected it when I interviewed him but, of course, I'm not qualified to do an I.Q. test on somebody.

"....

"I had not reviewed Dr. Bare's report at the time I completed my report."

"....

"Q. And you received Dr. Bare's report on or about September 19 of 2023 after your report?

"A. After my report, yes.

"[DEFENSE COUNSEL]: Judge, at this time the defendant would offer Defendant's 19, Dr. Robert L. Bare's report."

(R. 1733-35.) The State objected to the report's admission and requested a sidebar conference. (R. 1735.)

During the ensuing sidebar conference, defense counsel represented that Terrell wished to rely on four items contained within

60

Dr. Bare's report. (R. 1744-47.) The circuit court responded that it would allow Terrell to testify that she "gleaned" that information from Dr. Bare's report. When the circuit court indicated that it was "going to grant [the State's] objection or you are going to withdraw [Defendant's Exhibit 19]," Johnson withdrew the exhibit. (R. 1747, 1751.) Afterward, Terrell was permitted to testify about the four items she gleaned from Dr. Bare's report.

Considering defense counsel's decision to withdraw Defendant's Exhibit 19 at the conclusion of the sidebar conference, Johnson's argument on appeal is waived under the invited-error doctrine. "'"Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby."'" Sharifi v. State, 993 So. 2d 907, 936 (Ala. Crim. App. 2008) (quoting Robitaille v. State, 971 So. 2d 43, 59 (Ala. Crim. App. 2005), quoting in turn Phillips v. State, 527 So. 2d 154, 156 (Ala. 1988)). This is not a situation involving a failure to object that would ordinarily be entitled to plain-error review; rather, it is a situation where Johnson decided not to introduce the evidence at all. It should be self-evident that there can be no plain error in the circuit

court's failure to admit an exhibit that the defense did not offer into evidence.

Moreover, because Terrell was permitted to testify about the matters she "gleaned" from Dr. Bare's report, Johnson's argument alleges an error without injury. See Rule 45, Ala. R. App. P. The circuit court's decision to permit Terrell, a clinical social worker, to testify to those portions of the report relevant to her role as a mitigation expert, without admitting the entirety of the court-ordered forensic-evaluation report, was not an abuse of discretion. The circuit court's resolution of this issue permitted Johnson to present his case in mitigation while avoiding potential confusion of the issues, misleading of the jury, or improper testimony from an unqualified expert witness. See Rules 403, 602, 703, and 706(c), Ala. R. Evid. Accordingly, even if this claim were not waived under the invited-error doctrine, we would find no abuse of discretion in the circuit court's resolution of this issue.

## VIII.

Johnson next argues that the circuit court improperly admitted irrelevant evidence of "ammunition and weapons-related items as well as insinuations of prior thefts" in violation of Rule 404(b), Ala. R. Evid.

(Johnson's brief at 86.) In support of this argument, Johnson identifies photographic evidence and physical items admitted during the testimony of Investigator Hurst and evidence that documented the execution of a search warrant at Johnson and Tyson's Birmingham apartment. Johnson, however, did not object to the admission of any of the evidence he now contends was irrelevant and prejudicial. Accordingly, we will review this claim solely for plain error. See Rule 45A, Ala. R. App. P.

Whether to admit or exclude evidence is a matter within the sound discretion of the trial court, and its determination on such an issue "'will not be reversed except upon a clear showing of abuse of discretion.'" Garzarek, 153 So. 3d at 845-46 (quoting Ex parte Loggins, 771 So. 2d at 1103). Further, "'[a] fact is admissible into evidence if it has any probative value, however slight, upon a matter in the case.'" Primm, 473 So. 2d at 1157 (quoting C. Gamble, McElroy's Alabama Evidence § 21.01(1) (3d ed. 1977)).

Initially, we are skeptical that much of the evidence identified by Johnson constitutes evidence of "other crimes, wrongs, or acts" for purposes of Rule 404(b). For example, Johnson argues that "13 photographs of a shooting range target, three empty gun boxes, a basket

and bag with ammunition" and "business receipts for, and testimony about, firearms that Mr. Johnson allegedly purchased" violated Rule 404(b). (Johnson's brief at 86-87.) Other courts, however, have held that mere possession of a gun "is not, in and of itself, a criminal offense or bad act." Robinson v. State, 236 S.W.3d 260, 270 (Tex. App. 2007); see also People v. Samuels, 228 P.3d 229, 244-45 (Colo. App. 2009) (holding, under facts of that case, that testimony that defendant previously carried guns was not evidence of other crimes, wrongs, or acts when the testimony did not suggest defendant's conduct was wrong or constituted a bad act suggesting a particular character trait); Fuentes v. State, 10 N.E.3d 68, 73 (Ind. Ct. App. 2014) (observing that "the possession of a firearm, generally speaking, is not a misdeed"); McQueen v. Commonwealth, 339 S.W.3d 441, 448 (Ken. 2011) (finding no "merit in the argument that … testimony regarding firearm possession, alone, inside [one's] house, demonstrates a violent predisposition that infers conformity therewith" during murder trial). We find the reasoning of those decisions persuasive and hold that evidence of a defendant's mere possession or ownership of firearms, ammunition, or gun-related items, alone, does not constitute "other crimes, wrongs, or acts" such as to fall within the purview of Rule

404(b), Ala. R. Evid., when such possession is lawful and consistent with a defendant's exercise of a protected constitutional right.

Even if such evidence fell within the scope of Rule 404(b), evidence that Johnson -- accused of ambushing a police officer -- acquired guns and ammunition and trained to become proficient in marksmanship falls within the res gestae of the charged offense. In Hosch v. State, 155 So. 3d 1048, 1083 (Ala. Crim. App. 2013), this Court found that evidence pertaining to the defendant's plans to escape from prison were admissible under the res gestae exception to Rule 404(b) and was properly admitted during the defendant's trial for a capital murder that occurred as he fled authorities following his escape. Likewise, evidence indicating that Johnson was familiar with firearms and practiced marksmanship properly could have been considered as preparatory conduct for his subsequent ambush of Moody police officers.

Johnson also challenges evidence pertaining to a trace summary for a firearm compiled by the United States Bureau of Alcohol, Tobacco, Forearms, and Explosives (the "ATF"), State's Exhibit 52A, which indicated that the firearm was purchased by a person other than Johnson or Tyson, as well as a photograph of a laptop computer found during the

execution of the search warrant at Johnson and Tyson's apartment, State's Exhibit 99. Johnson challenges the laptop evidence because it bore a small Hoover High School property sticker. Johnson argues that the admission of those items of evidence violated Rule 404(b) because they suggested that he was a thief. (Johnson's brief at 88.)

As to the ATF firearm trace summary, we do not find that the admission of this evidence violated Rule 404(b). The ATF does not maintain any registry or ledger of firearm ownership. Rather, it records firearm transfers that are made through licensed dealers. There are, however, many means of legally transferring firearms that result in no ATF record at all. At trial, the testimonial evidence indicated that a Kel-Tec Sub 2000 firearm located in Tyson's vehicle was purchased in 2019 by Michael Honeycutt but that law-enforcement officers did not know how it ended up in Tyson's car. (R. 1036.) Johnson argues that this testimony was improper because it may have led to speculation that the weapon was stolen.

Testimony regarding the Kel-Tec Sub 2000 appears to have been offered to show that police processed the items found in Tyson's car and made investigative efforts to determine what items had potential

relevance to the charged offense. While evidence that law-enforcement officers attempted to trace the firearm but were unable to fully trace it back to Johnson or Tyson might be susceptible to an inference that the firearm was stolen, it is equally susceptible to an inference that the weapon was sold or traded as part of a private sale. We note that Johnson has not identified any arguments by the State suggesting that the weapon was stolen.

Further, the evidence of the ATF trace summary was analogous to evidence that a defendant's DNA was matched through the CODIS database or that a defendant's fingerprints were matched to recorded fingerprints. As this Court held in Whatley v. State, 146 So. 3d 437, 464-65 (Ala. Crim. App. 2010), and Brown v. State, 369 So. 2d 881, 884 (Ala. Crim. App. 1979), such evidence does not per se imply existence of a criminal record. Similarly, in this case, the evidence that police investigators were unable to trace the Kel-Tec firearm to Tyson or Johnson did not per se imply that the weapon was stolen rather than being purchased through a private firearms transaction.

The testimony and evidence regarding the laptop, however, is more problematic. The Hoover High School sticker shown affixed to the laptop

67

in State's Exhibit 99 is small and, in and of itself, would not ordinarily constitute evidence of other crimes, wrongs, or acts. Similar to the Kel-Tec evidence previously discussed, the Hoover High School sticker, alone, provided no reason to believe that the item might not have been purchased as surplus or otherwise might have come into Tyson and Johnson's possession lawfully. But the State's questioning of a police investigator improperly emphasized the existence of the property sticker.

Investigator Hurst's testimony described the laptop as "just a laptop that was recovered," having no true connection to the charged offense. (R. 1163.) Rather than leave it at this description, the State asked if the laptop had "any markings of ownership," to which Investigator Hurst replied, "Yes. It has Hoover High School markings on it." (R. 1163.) Although Johnson did not object to the State's question or Investigator Hurst's answer, this testimony called attention to the Hoover High School sticker and indicated that the laptop was still owned by Hoover High School.

As presented, Investigator Hurst's testimony linking "ownership" of the laptop to Hoover High School strongly suggested that the laptop had been stolen by Tyson or Johnson, in violation of Rule 404(b). Where,

as here, "the question of the admissibility of collateral-acts evidence is 'extremely close, [this Court has concluded] that any doubt about the admissibility of the testimony should, given the highly prejudicial nature of the evidence, be resolved in favor of the accused.'" Horton v. State, 217 So. 3d 27, 46 (Ala. Crim. App. 2016) (quoting Brewer v. State, 440 So. 2d 1155, 1158 (Ala. Crim. App. 1983)). Accordingly, we conclude that the circuit court erred by allowing this testimony.

Although we find that the admission of this testimony was erroneous, we also find that such error was harmless. As this Court observed in McAdory v. State, 895 So. 2d 1029 (Ala. Crim. App. 2004):

> "'Whether the improper admission of evidence of collateral bad acts amounts to prejudicial error or harmless error must be decided on the facts of the particular case.' R.D.H. v. State, 775 So. 2d 248, 254 (Ala. Crim. App. 1997); Hobbs v. State, 669 So. 2d 1030 (Ala. Crim. App. 1995). The standard for determining whether error is harmless is whether the evidence in error was 'harmless beyond a reasonable doubt.' Schaut v. State, 551 So. 2d 1135, 1137 (Ala. Crim. App. 1989), citing Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)."

895 So. 2d at 1036 (quoting Hunter v. State, 802 So. 2d 265, 270 (Ala. Crim. App. 2000)). Under the facts of this case, Investigator Hurst's limited testimony about the laptop did not rise to the level of plain error and was harmless beyond a reasonable doubt. See Floyd, 289 So. 3d at

69

402 (quoting <u>Ex parte Baker</u>, 906 So. 2d 277, 284 (Ala. 2004)) ("'The harmless error rule excuses the error of admitting inadmissible evidence only [when] the evidence was so innocuous or cumulative that it could not have contributed substantially to the adverse verdict.'").

After thoroughly reviewing the record on appeal, we have no trouble concluding that the jury's verdict was properly based on the numerous items of video evidence, Johnson's statement to police, the physical evidence from the motel room, and eyewitness testimony and not due to the testimony regarding the laptop found at Tyson and Johnson's Birmingham apartment. Johnson, therefore, is not entitled to any relief as to this claim.

## IX.

Johnson's ninth argument on appeal contends that the circuit court erroneously removed a qualified prospective juror from the venire but failed to remove disqualified prospective jurors. Specifically, Johnson argues that the circuit court erred when it failed to remove prospective jurors T.B. and S.S. for cause yet removed prospective juror D.G. based on her inability to set aside her opposition to the death penalty. (Johnson's brief at 89-92.)

A. <u>The Circuit Court's Failure to Remove Prospective Jurors T.B. and S.S.</u>

Johnson argues that the circuit court erred by failing to remove prospective juror T.B. for cause, sua sponte, because he had "a fixed opinion as to the guilt or innocence of the defendant." (Johnson's brief at 89-90 (citing R. 125-26).) Similarly, Johnson says that the circuit court should have removed prospective juror S.S. for cause, sua sponte, because S.S. "informed the court that he would hold it against Mr. Johnson if he elected not to testify." (<u>Id.</u> at 91-92 (citing R. 367-68.) Because Johnson did not seek either prospective jurors' removal for cause in the circuit court, we review both claims solely for plain error. <u>See</u> Rule 45A, Ala. R. App. P.

As to prospective juror S.S., Johnson used one of his peremptory challenges to remove S.S. from the venire. As a result, "any error in the failure of the [trial] court to sua sponte remove [S.S.] is harmless." <u>Peterson</u>, 326 So. 3d at 558 (citing <u>McMillan v. State</u>, 139 So. 3d 184, 258 (Ala. Crim. App. 2010)). In <u>McMillan</u>, this Court followed the Alabama Supreme Court's reasoning that "the failure to remove a juror is harmless when that juror is removed by the use of a peremptory strike." 139 So. 3d at 258 (citing <u>Bethea v. Springhill Mem'l Hosp.</u>, 833 So. 2d 1 (Ala. 2002)).

71

See also Brownfield v. State, 44 So. 3d 1, 34 (Ala. Crim. App. 2007) ("Here, as in Bethea, Brownfield has offered no evidence that the jury ultimately impaneled was biased. Brownfield concedes in his brief that he exercised a peremptory challenge to remove [the prospective juror] from the venire …. Therefore, even if the trial court's refusal to remove the complained-of veniremembers for cause was error, the error was harmless.").

As for prospective juror T.B., the record on appeal reflects that he raised his hand when the circuit court asked whether any prospective juror had "a fixed opinion as to the guilt or innocence of the defendant, Tapero Johnson, which would bias" their verdict. (R. 125-26.) After several other prospective jurors responded, the circuit court indicated that the "record is noted as to those who raised their hands and we will cover those issues later." (R. 126.)

Later, the circuit court asked T.B. further questions about potential sources of bias or prejudice. For example, T.B. was asked the following questions, to which he did not provide any affirmative responses:

> "Do any of you have any religious, moral, philosophical principles that would affect your ability to vote for or against the death penalty?" (R. 132.)

"Relationships to the victim or the family members [or] a close family member or close family member family friend employed with the [Office of District Attorney]?" (Id.)

"Is there anyone who is close or personal friends of Tapero Carleone Johnson?" (R. 134.)

"Is there any one of you who knows or think you should know about any facts of this case?" (R. 135.)

"Has anyone talked to you about this particular case?" (Id.)

"[H]ave you read any news articles, social media, or anything, watched television relating to the death of Moody Police Officer Stephen Williams?" (Id.)

"Has anyone relating to news print read social media, news, or television anything concerning the arrest of Tapero Carleone Johnson?" (Id.)

"As you sit here today, do you have any personal information or personal knowledge surrounding the death of Stephen Williams or the arrest of Tapero Carleone Johnson other than what you've heard or read in a news account? Anything else, any additional information?" (Id.)

"Finally, do any of you have a just cause or legal excuse why you feel you should not serve on this jury?" (Id.)

After this questioning, the circuit court permitted individual jurors to be identified by defense counsel for further questioning. (R. 136-38.) Defense counsel did not request that T.B. undergo further questioning.

Later, during the parties' questioning of prospective jurors, T.B. did not affirmatively respond to the question: "Do any of you have an interest, any interest in the conviction or acquittal of the defendant, Tapero Johnson?" (R. 250.) When T.B.'s panel was asked, "Any of you have a fixed opinion as to the guilt or innocence of the defendant which would bias your verdict," T.B. did not respond that he did. (Id.) When asked if he knew "anything about the facts which would influence [his] verdict," T.B. did not respond. (R. 251.) When asked if there was any reason he could not give both Johnson and the State a fair trial if selected to serve on the jury, T.B. did not affirmatively respond. (R. 251, 280.)

Though Johnson argues that T.B.'s initial response required the circuit court to remove him, sua sponte, for cause, "'[e]ven proof that a veniremember has a bias or fixed opinion is insufficient to support a challenge for cause.'" Ex parte Killingsworth, 82 So. 3d 761, 764 (Ala. 2010) (quoting McGowan v. State, 990 So. 2d 931, 951 (Ala. Crim. App. 2003)). Instead, a "'prospective juror should not be disqualified for prejudice or bias if it appears from his or her answers and demeanor that the influence of that prejudice or bias can be eliminated and that, if chosen as a juror, the veniremember would render a verdict according to

74

the law and the evidence.'" Id. (quoting McGowan, 990 So. 2d at 951).

Based on T.B.'s subsequent negative responses to relevant questioning

during voir dire, this Court cannot say that the circuit court erred, much

less plainly erred, by failing to remove T.B., sua sponte, for cause.

Although T.B. initially raised his hand in response to a question about a

"fixed opinion," subsequent questioning did not show that T.B. held a

fixed opinion that required the circuit court to act sua sponte.  For this

reason, Johnson is not entitled to relief.

B.    The Circuit Court's Removal of Prospective Juror D.G.

During voir dire, prospective juror D.G. affirmatively responded to

the circuit court's question: "[D]o any of you have any religious, moral, or

philosophical principles that would affect your ability to vote for or

against the death penalty?" (R. 148.) When asked about her response,

D.G. told the court: "I just don't feel like I would be able to decide

someone's fate." (Id.) Later, during individual voir dire, the circuit court

engaged in the following colloquy with D.G.:

> "THE COURT: So, [D.G.], you had mentioned some issues you
> might have with the death penalty, I think is what you said?
>
> "[D.G.]: Yes, sir.

"THE COURT: Can you tell the Court what your problems with the death penalty is [sic]?

"[D.G.]: Well, I don't feel like it's my place to decide if anyone lives or dies, or to play a part in deciding. I'm a nurse and I've seen a lot of people die. You know, I have a lot of thought over the years concerning that.

"THE COURT: Okay. The law in the State of Alabama says the State can seek the death penalty in capital murder cases. Do you understand that?

"....

"[D.G.]: I understand, yes.

"THE COURT: With that, the State in this case -- certainly that's part of the two outcomes. In the event that the defendant is found guilty, that could be an outcome where the decision could be made by the jury.

"....

"[D.G.]: Yes, I'm sorry.

"....

"THE COURT: As a juror, you will have evidence and testimony that's presented to you and you will have the law that's provided to you based on the law in the state of Alabama."

"[D.G.]: Right.

"THE COURT: Based on the evidence and testimony you hear, can you set aside any issues you have with regard to the death penalty, follow that law and vote for or against the death penalty?

76

"[D.G.]: Yes."

(R. 168-70.)

The State then questioned D.G. as follows:

"[PROSECUTOR]: …Do you believe that the death penalty is appropriate in cases, in murder cases, where the murder is heinous and atrocious?

"[D.G.]: I don't really have an opinion on that because I don't feel like I am -- I shouldn't say the word qualified is not correct. I don't feel like it is my place to decide if someone lives or dies.

"[PROSECUTOR]: So if you witnessed something that is horrendous, you don't think it is your place to pronounce a punishment of death?

"[D.G.]: If I witnessed something that is horrendous? Are you talking about the evidence presented in the trial?

"[PROSECUTOR]: Yes, ma'am.

"….

"THE COURT: How about see if this is a fair question. If the evidence and testimony that you hear as a juror and the law which I tell you beyond a reasonable doubt is the standard, do you feel that you can rule for or against the death penalty? Vote for or against the death penalty as a juror?

"[D.G.]: Yes."

(R. 171-73.) D.G. was then questioned by defense counsel, which led to the following exchange:

77

"[DEFENSE COUNSEL]: Now you stated that you cannot decide someone's fate. When you say you cannot decide someone's fate, is that a moral issue, a religious issue, or is that just who you are? How do you come up with that decision?

"[D.G.]: Well, okay, in nursing over the many years, you've heard people say, okay, this guy or this lady is a no code. This one over here, if they code, it's a slow code. I mean, don't really try to save them. I don't think that's right necessarily and I don't feel like it's anybody's place. You know, if the family wants this person to be revived, revive them if you can. As far as -- you know, I just don't feel like it's my place to say, all right, this person should die. I think I'll leave that up to God. It's not my place to do that.

"[DEFENSE COUNSEL]: So based on that circumstance you just testified to, you would choose -- you would choose life versus death if you had the choice?

"[D.G.]: I have never been in a trial.

"[DEFENSE COUNSEL]: Based on what you just said, the no code --

"[D.G.]: Oh.

"[DEFENSE COUNSEL]: -- would you choose life or would you choose death?

"[D.G.]: If my legal obligation were to save this person, I would save that person. I wouldn't say, okay, this person is too far gone, I'm not going to give it my all.

"THE COURT: That's in a nursing setting; that's what you are saying?

"[D.G.]: Yes.

"THE COURT: In a court setting as a juror, and I think I heard this a couple of times, could you set aside any of those feelings that you presented to [defense counsel] and listen to the evidence as it comes from the witness stand and offered and admitted and follow the law as I instruct you to follow the law? Can you do that and render a verdict either for or against the death penalty?

"[D.G.]: Yes."

(R. 173-75.)

The State moved for prospective juror D.G.'s removal for cause, arguing that she "made it clear that she cannot give the death penalty, it is not her place," and noting that during questioning "she wavered back and forth." (R. 181.) The circuit court took the State's motion under advisement.

During subsequent questioning about cases involving deaths from gunshot wounds, D.G. responded:

"I am just letting you know I'm really struggling with it. I feel also like unless it's self-defense that a life should not be taken. I don't think that that actually resolves what happened to bring us to that point by taking another life. And I have struggled with it since yesterday. I'm just -- that's how I feel about it."

(R. 370-71.) During follow-up questioning from defense counsel, D.G. noted that she was not a person who believed in "an eye for an eye" and was still struggling with the issue. (R. 371.) Thus, at the conclusion of

79

voir dire, the State renewed its motion to strike D.G. for cause. (R. 456.)

The circuit court granted the State's request over defense counsel's

opposition. (R. 457.)

> "'The test for determining whether a strike rises to the level of a challenge for cause is "whether a juror can set aside their opinions and try the case fairly and impartially, according to the law and the evidence." Marshall v. State, 598 So. 2d 14, 16 (Ala. Crim. App. 1991). "Broad discretion is vested with the trial court in determining whether or not to sustain challenges for cause." Ex parte Nettles, 435 So. 2d 151, 153 (Ala. 1983). "The decision of the trial court 'on such questions is entitled to great weight and will not be interfered with unless clearly erroneous, equivalent to an abuse of discretion.'" Ex parte Nettles, 435 So. 2d at 153.'"

Thompson v. State, 153 So. 3d 84, 115-16 (Ala. Crim. App. 2012) (quoting

Dunning v. State, 659 So. 2d 995, 997 (Ala. Crim. App. 1994)). "The

qualification of a juror is a matter within the discretion of the trial court."

Ex parte Dinkins, 567 So. 2d 1313, 1314 (Ala. 1990) (citing Clark v. State,

443 So. 2d 1287, 1288 (Ala. Crim. App. 1983)). "A trial judge's rulings on

a juror's qualifications are entitled to great weight on appeal and will not

be disturbed unless clearly shown to be an abuse of discretion." Id. (citing

Clark, 443 So. 2d at 1288).

The trial judge was in the best position to observe D.G.'s demeanor

and to weigh her answers. But even the cold record on appeal reveals that

D.G. struggled with the possibility of being called upon to decide between life or death due to her personal beliefs, which were reinforced by her experiences as a nurse. There is no evidence that the trial judge, who was able to view D.G.'s demeanor as she disclosed her reservations and struggles, abused his discretion in determining that D.G. would be unable to set aside her concerns so that they would not substantially impair her ability to perform her duties in accordance with the circuit court's instructions and her oath. See Ferguson v. State, 814 So. 2d 925, 941-42 (Ala. Crim. App. 2000) (quoting Taylor v. State, 666 So. 2d 36, 47 (Ala. Crim. App. 1994), quoting in turn Wainwright v. Witt, 469 U.S. 412, 424 (1985)); see also id. (quoting Taylor, 666 So. 2d at 47) ("A juror's bias needs to be proved with 'unmistakable clarity' because 'juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism.'"). Johnson, therefore, is not entitled to any relief as to this claim.

## X.

Johnson next challenges the circuit court's directive for the parties to strike the jury outside of its presence without a court reporter. Johnson, however, failed to object to this procedure at trial and explicitly

81

acquiesced to the procedure. Consequently, we review this claim solely for plain error. <u>See</u> Rule 45A, Ala. R. App. P.

According to the record on appeal, "the Defendant, Defendant's counsel, Circuit Clerk and the State were present during the strike process," but "[n]o transcript was taken." (2d Supp. C. 30.) Instead, the parties' strikes were recorded by the circuit clerk on a master strike list. (<u>Id.</u> at 31.) After the parties exercised their strikes, the reporter's transcript reflects that both parties were asked if there were "[a]ny motions before we approve the striking?" (R. 463.) Defense counsel responded: "We are satisfied, You Honor." (<u>Id.</u>) Thereafter, the circuit court went over the empaneled jury, including the alternate jurors, to make sure there were no mistakes or misunderstandings.

We begin by noting that Rule 19.4(a), Ala. R. Crim. P., requires that voir dire be transcribed, but it does not require the transcription of jury selection in a capital case. Although transcription may be the preferred practice, the Alabama Rules of Criminal Procedure do not compel such a result. Under these circumstances, where the rules did not require transcription and Johnson did not object to striking the jury without a court reporter, no error, much less plain error, occurred.

We also note that if any error occurred, Johnson invited it. Before

releasing the parties to select the jury, the circuit court announced:

"So with that we are going to strike down to 15. And if we have any motions after the striking we will just go in that jury room with the court reporter and do that so we don't have to break and break and break. Okay? If we do, we will take them up in one of these two jury rooms. Okay? Any questions? Any problems with that plan?

"....

"That's where you are going to strike with Kathy. After the striking if there is any Batson or whatever, if there is, I don't know that there is, if there is we will take those up so we can make sure the 15 are correct, then we will call 15 up. I will swear them in. I will release everybody. And if we have to take a few minutes, then we will start opening. Does that sound good to defense?"

(R. 461-62.) Defense counsel responded: "Yes, sir." (R. 462.) Having

affirmatively acquiesced to the circuit court's proposed procedure for

striking the jury, Johnson cannot now challenge on appeal that procedure

as error. See Sharifi, 993 So. 2d at 936 (quoting Robitaille, 971 So. 2d at

59, quoting in turn Phillips, 527 So. 2d at 156) ("'"Under the doctrine of

invited error, a defendant cannot by his own voluntary conduct invite

error and then seek to profit thereby"'"). The invited-error doctrine

applies to death-penalty cases and operates to waive any error unless the

error rises to the level of plain error. See Sharifi, 993 So. 2d at 936

(quoting <u>Robitaille</u>, 971 So. 2d at 59, quoting in turn <u>Snyder v. State</u>, 893 So. 2d 488, 518 (Ala. Crim. App. 2003)). As noted previously, no error, much less plain error, occurred in this regard. For these reasons, Johnson is not entitled to relief as to this claim.

## XI.

Johnson further argues that "the State used its peremptory strikes to remove three out of five (60%) of the qualified Black prospective jurors, including the only three Black women," in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79, 97 (1986). (Johnson's brief at 94.) Before the circuit court, however, Johnson did not assert a <u>Batson</u> challenge to the State's exercise of its peremptory challenges.

Previously, in <u>Lewis v. State</u>, 24 So. 3d 480, 489 (Ala. Crim. App. 2006) (citing <u>Pace v. State</u>, 714 So. 2d 316, 318 (Ala. Crim. App. 1995), rev'd in part on other grounds, 714 So. 2d 332 (Ala. 1997)), this Court observed that "[t]he plain-error analysis has been applied to death-penalty cases when counsel fails to make a <u>Batson</u> objection." More recently, however, this Court has held that it "'will no longer review <u>Batson</u> claims under our plain-error standard when those claims are raised for the first time on appeal.'" <u>Mulkey v. State</u>, [Ms. CR-2023-0304,

84

May 2, 2025] ___ So. 3d ___, ___ (Ala. Crim. App. 2025) (quoting Henderson v. State, [Ms. CR-21-0044, May 3, 2024] ___ So. 3d ___, ___ (Ala. Crim. App. 2024)). Consequently, Johnson recognizes that this claim is not reviewable considering this Court's pronouncement in Henderson. (Johnson's brief at 94-95.)

Johnson asks this Court to depart from Henderson because, in his case, "the trial court failed to attend or record the jury strike process." (Johnson's brief at 94.) We decline Johnson's invitation, however, because Johnson was given a plain opportunity to present any Batson claim to the circuit court, but it appears that trial counsel was satisfied with the jury empaneled. (R. 463.) Moreover, the circuit court presided over voir dire, and the trial judge's absence during the parties' exercise of their peremptory challenges had no effect on Johnson's ability to assert a Batson objection, had he wished to do so. Accordingly, Johnson is not entitled to any relief as to this claim.

## XII.

Johnson next argues that the circuit court erred by admitting what he characterizes as irrelevant, cumulative, and highly prejudicial photographs from the Sergeant Williams's autopsy. Specifically, Johnson

argues that the circuit court erred by "admitt[ing] 29 autopsy photographs, including a photograph depicting a grisly dissection of the victim's chest, neck, and face." (Johnson's brief at 98.) At trial, however, Johnson did not object to the admission of those photographs, or to any subsequent testimony about the images depicted in each. (R. 1346.) Accordingly, we review this claim solely for plain error. See Rule 45A, Ala. R. App. P.

This Court addressed a similar claim in Smith v. State, 246 So. 3d 1086 (Ala. Crim. App. 2017), where we observed:

"This Court has repeatedly held:

"'"Generally, photographs are admissible into evidence in a criminal prosecution 'if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.'" Bankhead v. State, 585 So. 2d 97, 109 (Ala. Crim. App. 1989), remanded on other grounds, 585 So. 2d 112 (Ala. 1991), aff'd on return to remand, 625 So. 2d 1141 (Ala. Crim. App. 1992), rev'd, 625 So. 2d 1146 (Ala. 1993), quoting Magwood v. State, 494 So. 2d 124, 141 (Ala. Crim. App. 1985), aff'd, 494 So. 2d 154 (Ala. 1986). "Photographic exhibits are admissible even though they may be cumulative, demonstrative of undisputed facts, or gruesome." Williams v. State, 506 So. 2d 368, 371 (Ala. Crim.

86

App. 1986) (citations omitted). In addition, "photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So. 2d 780, 784 (Ala. 1989). "This court has held that autopsy photographs, although gruesome, are admissible to show the extent of a victim's injuries." Ferguson v. State, 814 So. 2d 925, 944 (Ala. Crim. App. 2000), aff'd, 814 So. 2d 970 (Ala. 2001). "'[A]utopsy photographs depicting the character and location of wounds on a victim's body are admissible even if they are gruesome, cumulative, or relate to an undisputed matter.'" Jackson v. State, 791 So. 2d 979, 1016 (Ala. Crim. App. 2000), quoting Perkins v. State, 808 So. 2d 1041, 1108 (Ala. Crim. App. 1999), aff'd, 808 So. 2d 1143 (2001), judgment vacated on other grounds, 536 U.S. 953 (2002), on remand to, 861 So. 2d 453 (Ala. 2002).'

"Brooks v. State, 973 So. 2d 380, 393 (Ala. Crim. App. 2007)."

246 So. 3d at 1111.

During the autopsy, a spent projectile was discovered lodged in Sergeant Williams's esophagus. State's Exhibit 255, which depicted an anterior neck dissection performed during Sergeant Williams's autopsy, was used to illustrate the path of one of the bullets fired by Johnson into Sergeant Williams's body. As explained by the medical examiner, the dissection peeled back muscles that typically connect "somewhere in the chin area" and "down by [the] clavicle," to reveal a hemorrhage on the left

side of Sergeant Williams's body. (R. 1357-58.) That hemorrhage was related to "a wound track that goes behind the trachea and the thyroid gland[,] which is where the esophagus lies." (R. 1358.) In the opinion of the medical examiner, the wound resulting from the bullet that traveled through Sergeant Williams's left arm and neck was the cause of his death. (R. 1363.)

State's Exhibit 256, a photograph of the recovered projectile, was discussed by the medical examiner immediately following her testimony pertaining to State's Exhibit 255. That recovered projectile was later determined to have been fired from Johnson's Draco 7.62 x 39mm AK-style pistol. (R. 1456.)

Autopsy photographs that accurately depict the nature of a victim's wounds are admissible even if they are gruesome or cumulative. See Young v. State, 407 So. 3d 1139, 1175 (Ala. Crim. App. 2023) (citing Acklin v. State, 790 So. 2d 975 (Ala. Crim. App. 2000)). Here, there was no error, much less plain error, in the circuit court's admission of photographs depicting a fatal wound and recovered projectile linked to a weapon owned and possessed by Johnson. Accordingly, Johnson is due no relief as to this claim.

## XIII.

Johnson next contends that the State failed to authenticate State's Exhibits 8, 34, 35, and 258, "in violation of State and federal law." (Johnson's brief at 101.) State's Exhibit 8 was a compilation of audio recordings of the 911 calls received by the St. Clair County Sheriff's Office's communications office, as well as police radio traffic related to the initial dispatch of officers to the motel and the events occurring after Sergeant Williams was shot. State's Exhibits 34 and 35 were video recordings from the Super 8 Motel's surveillance system. State's Exhibit 258 was a composite exhibit assembled by a digital-forensics investigator that synchronized the motel video footage, 911 calls, and law-enforcement radio traffic into a single exhibit. Johnson argues that the "trial court's admission of this unreliable and prejudicial evidence violated [his] rights to due process, a fair trial, and a reliable conviction and sentence as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments." (Johnson's brief at 106.) We disagree.

During trial, Johnson did not object to the admission of any of the aforementioned exhibits. As to State's Exhibit 8, the record shows that it was admitted after the following exchange:

"[PROSECUTOR]: Your Honor, the State offers State's Exhibit 8 at this time.

"THE COURT: Okay. State's Exhibit 8 has been marked and offered with no objection. Admitted.

"[DEFENSE COUNSEL]: Judge, just for the record so that we are clear, 9 and 10 have been offered. Now 8 is a compilation of 9 and 10?

"[THE STATE]: It is.

"[DEFENSE COUNSEL]: No objection.

"(State's Exhibit Number 8 admitted.)"

(R. 575-76.) Similarly, Johnson did not object to the admission of State's

Exhibits 34 and 35, as evidenced by the record:

"[PROSECUTOR]: Your Honor, the State would offer State's Exhibit Number 34 at this time.

"THE COURT: 34 has been marked and offered by the State. Any objection?

"[DEFENSE COUNSEL]: No objection.

"THE COURT: No objection. Admitted 34.

"(State's Exhibit Number 34 admitted.)

"....

"[PROSECUTOR]: Your Honor, we would offer State's Exhibit 35 at this time.

"THE COURT: 35 has been marked and offered. Any objection?

"[DEFENSE COUNSEL]: No objection.

"THE COURT: No objection. 35 is admitted into evidence.

"(State's Exhibit Number 35 admitted.)"

(R. 1173-74.) When State's Exhibit 258 was offered during the testimony of Jaclyn Williams, defense counsel responded, "No objection, Judge," whereupon the circuit court admitted that exhibit into evidence. (R. 1406.) Consequently, we review this claim solely for plain error. See Rule 45A, Ala. R. App. P.

Johnson's brief assumes that he was prejudiced because, he says, those "exhibits created the erroneous impression that the State had created an accurate 'timeline' of events … when in fact it had not." (Johnson's brief at 105.) Johnson, however, ignores the testimony that accompanied the admission of State's Exhibit 258. Jaclyn Williams told the jury that State's Exhibit 258 was compiled manually and involved "cutting the video milliseconds, which is really hard to get all of them cut together at the same time" (R. 1402) because "each [motel video] channel had a time stamp on them, which unfortunately wasn't set correctly by the motel" (R. 1403). Thus, she testified that she had to "just cut the video

91

as close as I could to match all together looking at the videos and watching people walk by." (Id.) As for the 911 calls, she testified that she did "as best I could with the time frame" but that any of the video or audio components might be "off a few seconds." (R. 1404.) Additionally, Jaclyn Williams testified that one of the four motel cameras was loaded into her software program incorrectly, causing it to run "a little bit faster" than the other video files. (R. 1405.)

Under these circumstances, there is absolutely no merit to Johnson's contention that the admission of State's Exhibit 258 created an erroneous impression in the mind of the jury that the State had created an absolutely accurate timeline of events. There is nothing about the manner in which the exhibits were offered and received into evidence that would warrant relief from Johnson's conviction. Neither the record nor Johnson's brief point this Court to any error related to the admission of the exhibits, without objection, that is so obvious that our failure to notice it would seriously affect the fairness or integrity of the trial proceedings. Consequently, Johnson is due no relief.

Finally, although Johnson argues that the admission of those exhibits without authentication violated "federal law," the entirety of his

argument relates to admissibility under state-court precedent and state law. To be sure, Johnson argues in a single sentence that the admission of this evidence "violated [his] rights to due process, a fair trial, and a reliable conviction and sentence" as guaranteed by the United States Constitution, but he cites no authority for this bald assertion.[5] Accordingly, we have reviewed Johnson's "federal law" claim solely for plain error, and we find none.

XIV.

Johnson next challenges the circuit court's admission of what he characterizes as improper victim-impact evidence during the guilt phase of his trial. First, he contends that the medical examiner offered victim-impact evidence when she testified that Sergeant Williams would have felt pain as a result of his gunshot wounds and agreed that he would have

[5]Rule 28(a)(10), Ala. R. App. P., requires that a brief contain "the contentions of the appellant[] with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, or other authorities, and parts of the record relied on." Inasmuch as Johnson contends that the circuit court's admission of the exhibits without authentication violated federal law in the absence of an objection by the defendant, his brief failed to comply with Rule 28(a)(10). Johnson wholly failed to provide this Court any cases or authorities supporting his contentions. See Lewis, 371 So. 3d 863 (quoting Business Realty Inv. Co., 722 So. 2d at 752) (noting that "it is neither this Court's duty nor its function to perform an appellant's legal research").

"suffered" for "minutes versus hours." (Johnson's brief at 106-07 (citing R. 1362-63).) Second, he argues that the body-camera videos from Officers Locklear and Burns constituted improper victim-impact evidence because they depicted other officers' responses to the attack on Sergeant Williams, such as "hyperventilating," "crying," "embracing," and "other symptoms of shock and trauma." (Johnson's brief at 107-08.) Finally, Johnson asserts that the video from Sergeant Williams's body camera constituted improper victim-impact evidence because, after the shooting, it recorded sound of "other people providing encouragement and administering aid." (Johnson's brief at 108-09.)[6] Because Johnson failed to object on this ground at trial, we review his claim solely for plain error. See Rule 45A, Ala. R. App. P. We find none.

First, none of the challenged evidence could be legitimately characterized as victim-impact evidence. Neither the medical examiner's testimony nor the video exhibits offered characterizations or opinions

---

[6]Johnson also argues that the video from Officer McGuffie's body camera "did not show any relevant events and was inadmissible," but he does not identify any portion of that video that, he contends, constituted victim-impact evidence. This portion of Johnson's argument, therefore, is deemed waived under Rule 28(a)(10), Ala. R. App. P. Additionally, this Court has had the opportunity to review this evidence and finds that the circuit court did not abuse its discretion in admitting it into evidence.

about the crime, the defendant, or the appropriate sentence in this case, meaning they were not improper victim-impact evidence. See Gaston v. State, 265 So. 3d 387, 427-28 (Ala. Crim. App. 2018); Wilson v. State, 142 So. 3d 732, 784 (Ala. Crim. App. 2010). Moreover, even if this evidence could be construed as victim-impact evidence, the admission of the challenged testimony and exhibits did not affect the outcome of Johnson's trial or otherwise prejudice his substantial rights. See Wilson, 142 So. 3d at 785 (citing Rules 45 and 45A, Ala. R. App. P.). Accordingly, Johnson is entitled to no relief as to this claim.

## XV.

Johnson's fifteenth argument on appeal contends that the State improperly argued that the circuit court would reject the mitigating circumstances proffered by the defense during the penalty phase. Specifically, Johnson characterizes the prosecutor's argument as being that the trial judge "regularly rejects similar arguments from other defendants" (Johnson's brief at 110), because the prosecutor told the jury:

> "Every day we make decisions. The wise old judge that we have here when he talks to people who have been in trouble, on probation, when they would screw up he would say I'm on probation every day. I follow the law, I don't smoke dope, I'm on time most of the time, and this applies here. Ladies and gentlemen, just because somebody on the stand says these

95

aren't excuses doesn't mean that they don't want you to believe that they are excuses. You are to weigh that. Okay? Is this an excuse for what we've witnessed for the past ten days? Just because they say this isn't an excuse, it's an experience, doesn't mean it isn't a whole bunch of excuses. Again, <u>Judge is going to tell you how to weigh it</u>. You look at this and you look at this (indicating) and you compare the video with what you've seen."

(R. 1818-19 (emphasis added).) Johnson did not object to the prosecutor's argument  at trial, so this Court reviews his claim solely for plain error.

<u>See</u> Rule 45A, Ala. R. App. P.

> "'"'In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict.' <u>Smith v. State</u>, 698 So. 2d 189, 202-03 (Ala. Crim. App. 1996) …. 'The relevant question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process."' <u>Darden v. Wainwright</u>, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L. Ed. 2d 1 4 4 (1986), quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 94 S.Ct. 1868, 40 L. Ed. 2d 431 (1974)."'"

<u>Adams v. State</u>, 336 So. 3d 673, 685 (Ala. Crim. App. 2020) (quoting <u>Thompson</u>, 153 So. 3d at 157, quoting in turn <u>Simmons v. State</u>, 797 So. 2d 1134, 1161-62 (Ala. Crim. App. 1999) (opinion on return to remand)).

Having reviewed the prosecutor's argument in the context of the whole trial, we conclude that it was not improper. Contrary to Johnson's

96

characterization of the argument, the State did not misrepresent the circuit court's role as a neutral arbiter. Indeed, the prosecutor's argument reminded the jury that the judge would instruct them on the law, including how to weigh the aggravating and mitigating evidence -- which the circuit court correctly did.

Moreover, the prosecutor's argument appears to have been offered as a reply[7] to defense counsel's closing argument, which included the following statements:

> "But we are acknowledging the fact as children grow up, they are influenced. We are not saying the devil made him do it, what he did. We are not saying that. All of us are human beings. Human beings have different frailties, weaknesses, strengths. …
>
> "Just look at his life from start to finish. … I ask you to look at things about where he and where anyone learns their values, their respect, how to get along in life, what example has been set for this young man between the age of birth and where he sits today. … Does it account for everything? Excuse everything? No. But did it have an impact to tell us something

---

[7]Because we find no error in the prosecutor's argument, it would be somewhat unfair to characterize the challenged statements as a "reply in kind." Nonetheless, we observe that replies in kind are generally permissible and that "'[a] prosector has a right based on fundamental fairness to reply in kind to the argument of defense counsel.'" Hooks v. State, 141 So. 3d 1119, 1123 (Ala. Crim. App. 2013) (quoting DeBruce v. State, 651 So. 2d 599, 609 (Ala. Crim. App. 1993)).

that we want to know in sentencing this man? Of course it does."

(R. 1812-13.) It is also possible that the prosecutor was referencing Joanne Terrell's testimony during the penalty phase of trial. Terrell testified that Johnson completed an eight-week substance-abuse program while in prison and stopped using marijuana during the time he was released on parole. On cross-examination, the State asked Terrell if Johnson's ability to follow the rules for parole meant "he can follow the rules when he has to," to which Terrell answered, "Yes." (R. 1786.)

This Court has stated that "'[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract.'" Ferguson, 814 So. 2d at 945 (quoting Bankhead v. State, 585 So. 2d 97, 106 (Ala. Crim. App. 1989), rev'd on other grounds, Ex parte Bankhead, 625 So. 2d 1146 (Ala. 1993)). Even if we assumed that the prosecutor's anecdote was improper, we cannot say that the argument, considered in the context of Johnson's trial, rose to the level of plain error. As the Alabama Supreme Court has explained,

"[p]lain error is

"'error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings. <u>Ex parte Taylor</u>, 666 So. 2d 73 (Ala. 1995). The plain error standard only applies where a particularly egregious error occurred at trial and that error has or probably has substantially prejudiced the defendant. <u>Taylor</u>.'"

<u>Ex parte Walker</u>, 972 So. 2d 737, 742 (Ala. 2007) (quoting <u>Ex parte Trawick</u>, 698 So. 2d at 167). Johnson, therefore, is due no relief as to this claim.

## XVI.

Johnson also argues that his sentence was illegally imposed under the influence of passion and prejudice because, at his sentencing hearing, the circuit court permitted the State to present a letter that Sergeant Williams wrote to a fictitious "police killer" before his murder, as well as a letter written by Officer Christopher Johnson. (Johnson's brief at 112-13.) Johnson, however, did not object to either of these items at the time they were offered to the circuit court. Accordingly, we review this claim solely for plain error. <u>See</u> Rule 45A, Ala. R. App. P.

Our review of the record shows that Johnson's death sentence was not imposed under the influence of passion, prejudice, or any other

arbitrary factor.[8] Additionally, as the State notes in its brief, the circuit court sentenced Johnson in accordance with the jury's verdict finding that death was the appropriate sentence. (State's brief at 104 (citing § 13A-5-47, Ala. Code 1975).) The jury was not exposed to the materials Johnson characterizes as prejudicial, and the circuit court's sentence was mandated by statute. See § 13A-5-47(a), Ala. Code 1975 ("Where the jury has returned a verdict of death, the court shall sentence the defendant to death." (emphasis added)). Under these circumstances, Johnson's argument alleges an error without injury. See Rule 45, Ala. R. App. P. Johnson, therefore, is not entitled to any relief as to this claim.

## XVII.

Johnson's final argument on appeal challenges the legality of § 13A-5-46(f), Ala. Code 1975, which permits a jury to return a verdict of death "based on a vote of at least 10 jurors," rather than requiring a unanimous verdict. (Johnson's brief at 114-15.) In support of his claim, Johnson cites Ramos v. Louisiana, 590 U.S. 83, 93 (2020), Hurst v. Florida, 577 U.S. 92, 94 (2016), Ring v. Arizona, 536 U.S. 584, 589 (2002), and Apprendi v. New Jersey, 530 U.S. 584, 589 (2000). Johnson, however, does not cite

---

[8]See Part XVIII, infra.

Harris v. Alabama, 513 U.S. 504 (1995), which remains the last controlling United States Supreme Court decision pertaining to Alabama's capital-sentencing scheme. That decision permitted the sentencing judge to consider a jury's non-unanimous recommendation, trusting "the judge to give it the proper weight." Harris, 513 U.S. at 515.

"'Both this Court and the Alabama Supreme Court have upheld death sentences imposed after the jury made a non-unanimous recommendation that the defendant be sentenced to death.'" Gobble v. State, 104 So. 3d 920, 976-77 (Ala. Crim. App. 2010) (quoting Irvin v. State, 940 So. 2d 331, 366 (Ala. Crim. App. 2005)); see also Ex parte McNabb, 887 So. 2d 998, 1000 (Ala. 2004). To the extent that Johnson argues that § 13A-5-46(f) is contrary to Ring and Apprendi, both this Court and the Alabama Supreme Court have rejected that argument on numerous occasions. See, e.g., Ex parte Hodges, 856 So. 2d 936 (Ala. 2003); Ex parte Waldrop, 859 So. 2d 1181 (Ala. 2002); Harris v. State, 2 So. 3d 880, 903-06 (Ala. Crim. App. 2007); Turner v. State, 924 So. 2d 737 (Ala. Crim. App. 2002); Stallworth v. State, 868 So. 2d 1128, 1178 (Ala. Crim. App. 2001) (opinion on return to second remand).

Although <u>Harris</u> was decided before the amendment to § 13A-5-47 making the jury's determination binding upon the circuit court, its underlying rationale nonetheless permits the imposition of a death sentence upon a verdict of death supported by at least 10 jurors' votes. Consequently, Johnson is entitled to no relief as to this claim.

XVIII.

Because Johnson was sentenced to death, this Court is required to address the propriety of Johnson's sentence. § 13A-5-53, Ala. Code 1975. Our review of the record finds that Johnson's sentence was not imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. § 13A-5-53(b)(1), Ala. Code 1975. Furthermore, we have conducted an independent weighing of the two aggravating circumstances and the mitigating circumstances in this case and find that death was the appropriate sentence and that a sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. § 13A-5-53(b)(2) and (3), Ala. Code 1975; <u>see</u> <u>also</u> <u>Centobie v. State</u>, 861 So. 2d 1111 (Ala. Crim. App. 2001) (finding death sentence appropriate for defendant convicted of killing an on-duty Moody police officer).

Based on the foregoing, the judgment of the circuit court is affirmed.

AFFIRMED.

Cole, J., concurs. Windom, P.J., concurs in part and concurs in the result, with opinion. Kellum and Minor, JJ., concur in the result.

WINDOM, Presiding Judge, concurring in part and concurring in the result.

I concur in all parts of the main opinion except for Part I.B. and Part VIII of the "Discussion" section. As to those parts, I concur in the result.